**PRECEDENTIAL**


UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 09-4495 & 09-4600
_____

BAREFOOT ARCHITECT, INC.,
Appellant/Cross-Appellee

v.

SARAH BUNGE; THOMAS F. FRIEDBERG;
TRACY ROBERTS; SPRINGLINE ARCHITECTS, L.L.C.
Appellees/Cross-Appellants
_____

On Appeal from the District Court
of the United States Virgin Islands
District Court No. 3-04-cv-00099
District Judge: The Honorable Lawrence F. Stengel

Submitted Pursuant to Third Circuit L.A.R. 34.1(a)
December 16, 2010

Before: McKEE, *Chief Judge*, FUENTES and SMITH,
*Circuit Judges*


1

(Filed:  January 14, 2011)

Shawn E. Goodman
Werner Sabo
Sabo & Zahn
401 North Michigan Avenue
Suite 2050
Chicago, IL

Steven Hogroian
Kotas & Hogroian
P.O. Box 1208
Cruz Bay, St. John
USVI
        *Counsel for Appellant/Cross-Appellee*

Thomas F. Friedberg
Law Offices of Friedberg and Bunge
P.O. Box 6814
610 West Ash Street
Suite 1400
San Diego, CA  92166

Robert L. Kenny
501 West Broadway
Suite 1370
San Diego, CA

Henry C. Smock
Kyle R. Waldner

2

Smock & Moorehead
No. 11A Norre Gade
P.O. Box 1498
St. Thomas, VI
     *Counsel for Appellees/Cross-Appellants*

—————————————

OPINION

—————————————

SMITH, *Circuit Judge.*

Before the Court are a set of cross-appeals from three separate orders issued by the District Court of the United States Virgin Islands. Pursuant to Rule 12(b)(6), the District Court dismissed three of the five counts of the defendants' counterclaim; the defendants appeal in part. After discovery, the District Court granted summary judgment to the defendants as to the plaintiff's two federal claims; the plaintiff appeals in part. The summary judgment order also dismissed without prejudice the plaintiff's remaining territorial-law claim pursuant to 28 U.S.C. § 1367(c), on the ground that no federal causes of action remained in the case. A separate order filed a few days later *sua sponte* dismissed the defendants' two remaining territorial-law counterclaims for the same reason; the defendants appeal. We will affirm the entry of summary judgment on the plaintiff's copyright claim, but will vacate the District Court's decisions dismissing the counterclaims.

3

## I

Sarah Bunge and Thomas Friedberg ("the owners") wanted to build a home in the Virgin Islands. They approached Michael Milne, an architect who at the time was vice-president and director of the Virgin Islands architectural firm Village Vernacular, Inc. While still a Village employee, Milne began work on the project. The owners executed a letter of intent and paid a $1,000.00 deposit to hire Village on June 10, 1999. Milne prepared a series of sketches and preliminary drawings for the project, and the owners paid another $6,650.00 to Village on October 5, 1999. All the drawings and all of Milne's correspondence throughout 1999 bore Village's imprint. In April 2000, Milne submitted conceptual drawings for the project to the Virgin Islands Department of Planning and Natural Resources, the local permitting body; these drawings were also marked with Village's legend.

Village was, however, in the process of getting out of the active practice of architecture, so Milne needed someplace else to ply his trade. At some point in 1999 or 2000—the record contains no evidence of the exact date—Milne formed a second corporation, Barefoot Architect, Inc., where he continued his architecture practice and served as owner and president. Bunge and Friedberg wanted to continue working with Milne, and on August 31, 2000 they entered into a standard American Institute of Architects (AIA) contract to engage Barefoot's architectural services. The agreement calls for a contract price of $123,495.00 covering "basic services," a category defined in the contract's Article 2. The contract

also defines "additional services," which were to be billed at $85.00 per hour over and above the "basic services" price.

By June 7, 2001, the owners had paid more than the entire "basic services" price, but had yet to receive full construction drawings. Barefoot nevertheless demanded that it be paid a further $281,698.43 for "contingent additional services," which it claims to have rendered on account of major changes to the project initiated by the owners. Neither side was happy with this state of affairs; angry correspondence ensued. The owners refused to pay for the "contingent additional services," and on December 11, 2001, Milne sent them a letter on Barefoot letterhead stating that his firm was suspending its architectural services pursuant to subparagraph 8.1 of the contract. The owners reacted by hiring Tracy Roberts of Springline Architects, LLC to replace Barefoot and to finish the project.

Barefoot filed suit on July 27, 2004, alleging that Bunge, Friedberg, Roberts, and Springline had violated its copyright in the home design. The complaint also asserted claims for violation of the Lanham Act and breach of contract. In addition to an answer, the defendants filed five counterclaims: breach of contract, fraud, breach of fiduciary duty, violation of the Lanham Act, and tortious interference with contractual relations. Barefoot moved to dismiss the counterclaims, and on June 22, 2007 the District Court granted the motion as to the fraud, Lanham Act, and tortious interference claims, leaving the contract and fiduciary duty counterclaims intact.

On September 9, 2008—after the court's decision on the motion to dismiss—Barefoot and Village executed a "Memorandum of Transfer," which purported to memorialize an October 5, 1999 oral transfer of the copyright to the project's design from Village to Barefoot. Milne signed this memorandum on behalf of both firms (as Village's vice-president and director, and as Barefoot's president); Glenn Speer, as Village's president, also signed on his firm's behalf.

The defendants then moved for summary judgment, which the District Court granted with respect to the Copyright Act and Lanham Act claims. The court proceeded to decline supplemental jurisdiction over Barefoot's breach-of-contract claim, dismissing it without prejudice. Shortly thereafter, the District Court *sua sponte* dismissed the remaining counts of the counterclaim (for breach of contract and of fiduciary duty), which were also territorial-law claims over which it declined to exercise supplemental jurisdiction.

The parties cross-appealed. Barefoot asks only that we reinstate its copyright claim. The defendants/counterclaimants limit their appeal to the tortious interference, breach of contract, and breach of fiduciary duty counterclaims.

II

We have jurisdiction pursuant to 28 U.S.C. § 1291. We review district court decisions regarding both summary judgment and dismissal for failure to state a claim under the same de novo standard of review. *Giles v. Kearney*, 571 F.3d 318, 322 (3d Cir. 2009) (summary judgment); *Santiago v. GMAC Mortg. Group, Inc.*, 417 F.3d 384, 386 (3d Cir. 2005)

6

(motion to dismiss).  Summary judgment should be granted only when the record "shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  While "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor" in determining whether a genuine factual question exists, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986), summary judgment should not be denied unless there is sufficient evidence for a jury to reasonably find for the nonmovant. *Id.* at 249; *Giles*, 571 F.3d at 322.  To withstand a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, ___ U.S. ___, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

The doctrine of *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938), applies to cases decided by the federal courts over what would be state-law claims if the Virgin Islands were a state. *Edwards v. Hovensa, LLC*, 497 F.3d 355, 360–61 (3d Cir. 2007).  Thus we apply the rule of decision that the Virgin Islands Supreme Court would apply in adjudicating issues of territorial law.  The Virgin Islands Code provides that "[t]he rules of the common law, as expressed in the restatements of the law approved by the American Law Institute, and to the extent not so expressed, as generally understood and applied in the United States, shall be the rules of decision in the courts of the Virgin Islands in cases to which they apply, in the absence of local laws to the contrary." 1 V.I.C. § 4.

7

III

A

The District Court granted summary judgment and dismissed Barefoot's copyright claim on the ground that Barefoot did not own the copyright to the architectural plans at the time those rights were allegedly infringed, and that it thus lacks standing to assert a copyright infringement action. The court reasoned as follows. When Milne originally created the copyrighted work, he was an employee of Village. Under the works-for-hire doctrine, Village is presumed to own the copyrights to works created by its employees during the course of their employment. *See* 17 U.S.C. § 201(b). Plaintiff concedes this much to be true, but argues that Village effectuated a transfer of the copyright in question to Barefoot in 1999, such that Barefoot was the rightful owner at the time that the alleged infringement began. The District Court disagreed, concluding that there was no evidence to support such a transfer, and that Barefoot therefore had not raised a genuine question of fact as to whether it owned the copyright at the relevant point in time.

Ownership of a copyright is freely transferrable "by any means of conveyance or by operation of law." 17 U.S.C. § 201(d). However, a transfer (other than one by operation of law) "is not valid unless an instrument of conveyance, or a note or memorandum of the transfer, is in writing and signed by the owner of the rights conveyed or such owner's duly authorized agent." 17 U.S.C § 204(a). No such writing existed in this case until the "Memorandum of Transfer" dated September 9, 2008—nearly nine years after the alleged

assignment took place (October 5, 1999), and more than four years after this lawsuit was filed. So the first question we must address is whether such a long-delayed memorialization can successfully validate a long-ago oral copyright transfer.

This being an issue of statutory interpretation, we begin with the text. Section 204(a)—frequently referred to as the Copyright Act's "statute of frauds"—specifically contemplates a post-hoc "note or memorandum of the transfer," as distinct from an "instrument of conveyance," as a permissible means of satisfying the Act's writing requirement. The "note or memorandum" does not itself constitute the transfer; rather, the writing renders valid and enforceable in court a change in ownership that has already taken place. *See* 3 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 10.03[A][3] & nn.20–22 (Rev. Ed. 2009). Under the statute's plain terms it is clear that an oral transfer can be given legal effect by a subsequent signed writing.

Of course, even under this construction it is possible for a writing to be simply too far removed in time from the event it purports to memorialize, so that there can be no validation of the past event. The Ninth Circuit so held in *Konigsberg Int'l v. Rice*, 16 F.3d 355 (9th Cir. 1994), a case involving novelist Anne Rice's alleged oral agreement "to sketch out a romantic melodrama involving a love triangle between a resurrected mummy, an English heiress and Queen Cleopatra," and to license the story to Konigsberg to serve as the basis for various derivative works. *Id.* at 356. The alleged oral contract granted Konigsberg a two-year period to exploit its rights, with an option to extend. The only extant

9

signed writing memorializing the contract, however, was a letter from Rice to Konigsberg's lawyer, sent after litigation had commenced. The letter read, "as far as I am concerned, these contracts, though never signed, were honored to the letter. . . . [The licensees] got exactly what they paid for." *Id.* Konigsberg sought to use this letter to prove that Rice had granted a license, but the court refused to credit that theory. Writing for a unanimous panel, Judge Kozinski argued that the writing requirement is designed to prevent an author from "giv[ing] away his copyright inadvertently," to "force[] a party who wants to use the copyrighted work to negotiate with the creator to determine precisely what rights are being transferred and at what price," and to provide a "guidepost for the parties to resolve their disputes." *Id.* at 357 (quoting *Effects Assocs., Inc. v. Cohen*, 908 F.2d 555, 557 (9th Cir. 1990)). These goals, according to the Ninth Circuit, are only served if the writing is "executed more or less contemporaneously with the agreement" and is "a product of the parties' negotiations." *Id.*

*Konigsberg* distinguished the Copyright Act's statute of frauds from its contract-law cousin (which can be satisfied by a letter like the one Rice wrote, *see* Restatement (Second) of Contracts § 133 & cmt. b) on the ground that in contract law, the statute "serve[s] a purely evidentiary function—to prevent enforcement through fraud or perjury of fictitious agreements." 16 F.3d at 357. By contrast, a copyright assignment is, under the terms of § 204(a), simply "not valid" unless there is a writing. *Id.* According to the Ninth Circuit, an oral contract subject to the statute may be valid but unenforceable in court, but a copyright transfer cannot even

take place without a writing. This reading of § 204(a) compelled the court to interpret the statutory requirements strictly, so as to demand substantial contemporaneity. So construed, § 204(a) was not satisfied by "a letter [that] was written three and a half years after the alleged oral agreement, a year and a half after its alleged term would have expired and 6 months into a contentious lawsuit." *Id.*[1]

We consider this analysis unconvincing. To begin, while the text of the statute (as we observed above) clearly allows for a subsequent writing to effectuate an earlier oral transfer, it does not specify a time period during which the writing must be consummated. Indeed, it does not even impose a fuzzy standard like "substantially contemporaneous." The Ninth Circuit's decision to imply such a requirement appears to rest entirely on its assessment of the copyright statute's purposes, in contradistinction to those of the contract-law statute of frauds. According to the *Konigsberg* court, the latter serves a "purely evidentiary function," while the former has the additional purpose of "enhanc[ing] predictability and certainty of ownership." *Id.* (citations omitted). However, it is not clear that this second goal is anything more than a rewording of the purpose of ordinary statutes of frauds. Just as requiring a written contract prevents enforcement of a nonexistent obligation through the exclusion of fraudulent, perjured, or misremembered evidence, requiring a writing for enforcement of a copyright assignment "enhances predictability and certainty of ownership" by preventing litigants from

---

[1] The court also observed that the letter was not a product of negotiations. 16 F.3d at 357.

11

enforcing fictitious "agreements" through perjury or the testimony of someone with a faulty memory. *See* Victor H. Polk, Jr. & Joshua M. Dalton, Equitable Defenses to the Invocation of the Copyright Act's Statute of Frauds Provision, 46 J. Copyright Soc'y U.S.A. 603, 611 (1999). That is, the two statutes serve essentially identical purposes, even if some courts may have phrased those purposes so as to make them sound different.

Furthermore, to the extent that the Ninth Circuit's argument hinges on a distinction between an oral copyright transfer not being "valid" and an oral contract simply being unenforceable, it is a bit hard to discern the practical difference. As leading commentators have observed, "[a] contract is 'valid' [only] insofar as it has legal operation and 'invalid' insofar as it has not," 4 Joseph M. Perillo, Corbin on Contracts § 12.5 (rev. ed. 1997), meaning that a contract rendered unenforceable by the statute of frauds is not actually "valid" in any meaningful sense. *See also id.* at n.12 ("[I]t should not be said that the statute [of frauds] does not affect the 'validity' of the contract, because validity cannot be separated from remedy."). Accordingly, it is perfectly reasonable to read § 204(a) as allowing enforcement of oral agreements through the same sorts of later-drafted, informal writings that are universally held to satisfy the statute of frauds in the contract setting.

Other courts, including a differently constituted panel of the Ninth Circuit in a post-*Konigsberg* case, have reached that conclusion—and have done so in circumstances more closely analogous to our own than those presented in *Konigsberg*. In *Magnuson v. Video Yesteryear*, 85 F.3d 1424

12

(9th Cir. 1996), a divided panel of the Ninth Circuit held sufficient a writing dated more than fourteen years after the oral transfer.  The plaintiff, Magnuson, was both CEO of the transferor corporation (Columbus Productions, Inc.) and the owner of the transferee firm (John Magnuson Associates), but he did not memorialize the change in copyright ownership at the time it took place.  The defendant in Magnuson's copyright infringement suit argued that the assignment was invalid and that Columbus therefore still owned the rights.  (Columbus was no longer operating and had no ability to sue.)  The dissent took the position that *Konigsberg* controlled, *id.* at 1432 (Fernandez, J., dissenting), but the majority distinguished the case before it on the ground that "the problem with the writing in that case was not so much that it was not contemporaneous with the agreement but that it was 'not the *type* of writing contemplated by section 204' because it 'came far too late to provide any reference point for the parties' licensing disputes.'"  *Id.* at 1429 n.1 (majority op.) (quoting *Konigsberg*, 16 F.3d at 357).  This made a difference: in *Magnuson* there was no need for a "reference point" to resolve any dispute, because no dispute existed: no one involved in the putative transfer contended that it had not occurred.  *See id.*  The *Magnuson* court found particularly compelling the reasoning of *Eden Toys, Inc. v. Florelee Undergarment Co.*, 697 F.2d 27, 36 (2d Cir. 1982) (citations omitted):

> [S]ince the purpose of the provision is to protect copyright holders from persons mistakenly or fraudulently claiming oral licenses, the "note or memorandum of the transfer" need not be made

13

at the time when the license is initiated; the requirement is satisfied by the copyright owner's later execution of a writing which confirms the agreement. In this case, in which the copyright holder appears to have no dispute with its licensee on this matter, it would be anomalous to invoke this provision against the licensee.

The Eleventh Circuit also follows the rule that an oral agreement is valid if it is later ratified in writing, *see Arthur Rutenberg Homes, Inc. v. Drew Homes, Inc.*, 29 F.3d 1529, 1533 (11th Cir. 1994), and has applied it to facts quite similar to those in the case before us. In *Imperial Residential Design v. Palms Development Group*, 70 F.3d 96 (11th Cir. 1995) (per curiam), Imperial Residential Design drew up a set of floor plans for Regal Classic Homes. One of Imperial's principals then orally transferred to Regal all of Imperial's rights in the design; both parties believed that the plan belonged solely to Regal. Regal subsequently discovered a competitor, Palms Development Group, marketing similar plans, and sued for copyright infringement. Palms defended on the ground that Regal did not own the copyright. After the initial lawsuit had been filed (there were several iterations), Regal obtained a written agreement that it claimed memorialized the original oral transfer of Imperial's copyright. The court decided that, at least in a case like that before it, in which the assignor and the assignee did not dispute ownership and in fact were both plaintiffs in the same infringement case, it would not demand a contemporaneous writing. *Id.* at 99. In so holding, the court reasoned that "the

14

chief purpose of section 204(a) (like the Statute of Frauds) is to resolve disputes between copyright owners and transferees and to protect copyright holders from persons mistakenly or fraudulently claiming oral licenses or copyright ownership." *Id.* Because there was no dispute between the original copyright holder and the putative transferee, the court thought that "it would be unusual and unwarranted to permit a third-party infringer to invoke section 204(a) to avoid suit for copyright infringement." *Id.* (citing *Eden Toys*, 697 F.2d at 36).

We agree with the reasoning of *Magnuson*, *Imperial*, and *Eden Toys*. At least where there is no dispute between transferor and transferee regarding the ownership of a copyright, there is little reason to demand that a validating written instrument be drafted and signed contemporaneously with the transferring event. No one in the cases just cited (or in the case now before this Court) has "giv[en] away his copyright inadvertently," or lost his chance to negotiate, or been left without a "guidepost" for resolving a dispute. *See Konigsberg*, 16 F.3d at 357. Nor are concerns regarding certainty compelling: none of the defendants in any of these cases thought that it owned a copyright, only to find out through litigation that its claim was invalid because of a snafu involving the written instrument. All of them knew or should have known that they were at least potentially infringing *someone's* copyright—even if they perhaps could not be precisely sure whose.[2] Because none of the considerations

---

[2] The defendants in this case contend that they hold a valid license to make use of the plans that Milne and his associates have worked up, but we have no need to reach that argument.

15

driving *Konigsberg*'s insistence on contemporaneity come into play in a case in which there is no dispute between transferor and transferee, we hold that a third-party infringer in such a case cannot evade liability by invoking § 204(a) and demanding a contemporaneously-drafted instrument.

B

Resolving that legal question does not, however, necessarily lead to the conclusion that Barefoot prevails here and that the District Court should be reversed. For a writing to "validate" a past transfer, the past transfer must have actually occurred. *See Magnuson*, 85 F.3d at 1429 (observing that "the district court made several factual findings that are not clearly erroneous indicating that Columbus did, in fact, transfer its copyright to John Magnuson Associates in the seventies"); *Imperial*, 70 F.3d at 96 ("Both Wilson and McGuffie testified that Wilson then orally transferred to Regal all his company's rights in the Regency design and that both believed that the Regency plan was the sole property of Regal."); *Rutenberg*, 29 F.3d at 1530 ("It is uncontroverted, however, that Heise and Chrysalis entered into an oral agreement that Heise would prepare these plans for Chrysalis, and that the copyright in the 'Verandah II' plan would be owned by Chrysalis."); *Eden Toys*, 697 F.2d at 36 (holding that a later writing can validate an earlier transfer, but remanding to the district court for determination of whether "Paddington could orally or through conduct grant an exclusive license to Eden"). We agree with the District Court's conclusion that Barefoot has failed to raise a triable issue of fact as to whether the alleged 1999 oral transfer ever occurred.

16

The purported transfer of Village's copyright interest here is in the nature of an assignment. In contract law, "[a]n assignment of a right is a manifestation of the assignor's intention to transfer it by virtue of which the assignor's right to performance by the obligor is extinguished in whole or in part and the assignee acquires a right to such performance." Restatement (Second) of Contracts § 317(1). Analogously, an assignment of a copyright "is a manifestation of the assignor's intention to transfer [the copyright] by virtue of which the assignor's [copy]right . . . is extinguished in whole or in part and the assignee acquires [the copyright]." All that is required for the completion of an assignment is that the assignor "manifest an intention to transfer the right to another person . . . . The manifestation may be made to the other or to a third person on his behalf and, except as provided by statute or by contract, may be made either orally or by a writing." Id. § 324. No particular formality is required, except to the extent required by statute. Id. cmt. a. Thus, anyone with authority to convey Village's property to another[3] could have

_____

[3] The defendants argue that Milne lacked authority to effectuate the transfer, because such power was vested exclusively in Village's board of directors acting as a whole. This argument lacks merit. As an executive officer, Milne was an agent of the corporation and had the power to bind the corporation to contracts and to assign its assets. See 2 William Meade Fletcher, Cyclopedia of the Law of Corporations §§ 434, 437 (rev. ed. 2006) (officers are agents of the corporation, whose powers are determined by agency law; "[t]heir authority may be implied from their conduct and the acquiescence of the directors"); Restatement (Third) of Agency § 2.01 & cmt. b (an agent has actual implied authority both "to do what is necessary, usual, and proper to accomplish or

17

orally assigned the copyright to Barefoot by saying, "Through me, Village hereby assigns you its copyright in the Bunge project design," or other words to the same effect (provided that Village later backed up the oral statement with a writing).

The complication in this case is that the copyright was allegedly assigned by Village, acting through Milne, and assigned to Barefoot, also acting through Milne. Barefoot nevertheless insists that the transfer of rights occurred orally, on October 5, 1999, as the Memorandum of Transfer attests. With the issue so framed, we cannot conclude that the District Court erred in finding no evidence of a transfer. Barefoot proffers three possible sources of such evidence, but none is availing.

First, Barefoot argues that the Memorandum itself "is the best evidence of assignment," because both Milne (an officer, director, and shareholder of Village) and Speer (Village's president, as well as a director and shareholder) signed a document confirming that the assignment took place. We disagree. The idea of a memorandum "validating" an earlier copyright transfer depends on the original transferring event actually having transpired. In each of the cases cited above for the proposition that a later writing can confirm an earlier oral grant, there was evidence of this crucial historical fact extrinsic to the writing. None of those courts confronted

perform an agent's express responsibilities" and "to act in a manner in which an agent believes the principal wishes the agent to act based on the agent's reasonable interpretation of the principal's manifestation in light of the principal's objectives and other facts known to the agent").

18

a case in which it was argued that the same document both proved that an oral transfer occurred and gave legal effect to that otherwise unenforceable promise. We do not think that a "note or memorandum of transfer" can simultaneously serve each of these purposes. If it could, a distantly post-hoc writing would be capable of rendering enforceable a (possibly fictional) "transfer" that purportedly took place years or decades earlier but for which there is no independent evidence. This would enable a perjured or misremembered writing to override actual historical events. Suppose, for instance, that O gave A a written document conveying his copyright in 2005. Later, out of spite or faulty memory, O drafts a document purporting to validate a 2004 oral transfer of the same copyright to B, even though there is no evidence that this assignment actually took place. If the memorandum to B were enough to prove that the event occurred, then for practical purposes A never owned the copyright despite holding an instrument of conveyance: B holds a document showing that he took ownership in 2004 and that O therefore did not have any copyright to assign in 2005. If B's document is enough on its own to prove that the oral transfer happened, A has no recourse, as there is in all likelihood no way for him to prove that such an event did *not* transpire. Thus B would be able to sue A for infringement despite the fact that O never actually said anything to him about the copyright until after he had already given the transferring instrument to A. This is the kind of result that the writing requirement is intended to avoid. We should not construe § 204(a) in a way that would permit such an outcome. If Barefoot is to get past summary judgment it must present evidence, apart from the Memorandum of Transfer itself, that

19

is sufficient to allow a conclusion that the October 5, 1999 oral assignment actually occurred.

The second proffered bit of evidence for the assignment is a pair of checks (one from Village to Barefoot, the other—which appears to have been scratched out, though not voided—from Barefoot to Village) that, according to Barefoot, represent consideration from Barefoot to Village for the transfer of the project in question. However, nothing in the checks themselves or the relevant deposition testimony indicates that the checks constituted compensation for the sale of any copyright. Reading Speer's testimony, one gets a vague sense that the checks were part of the process of shuffling things around when Village was getting out of the practice of architecture and Barefoot was starting up, but there is nothing to link the checks to the copyright. Even if the checks were part of a general transfer of the project from one entity to the other, such an exchange would not have "necessarily required a copyright transfer," as plaintiff asserts. Barefoot might (for instance) have subcontracted to work on the project without buying the copyright, or it might have just exploited the copyrighted material with no right to do so, hoping that it wouldn't be sued. The business arrangement isn't spelled out anywhere, and the record contains nothing to show that Barefoot bought the copyright. Thus the checks themselves carry little evidentiary weight. More to the point, even on the most charitable interpretation, the checks simply are not evidence upon which a jury could conclude that Village orally assigned its copyright to Barefoot on October 5, 1999.

Barefoot's third attempt at showing that the transfer occurred hinges on the contract signed by the owners and Barefoot in August 2000. As just noted, the mere fact that Barefoot had taken over work on the project does not imply that Village had orally transferred its copyright on October 5, 1999. And while the contract stipulates that Barefoot "shall be deemed the authors and owners of their respective Instruments of Service and shall retain all common law, statutory and other reserved rights, including copyrights," that provision is meaningless if Village (and not Barefoot) owned the copyright all along. The copyright provision does not prove, or even suggest, that Barefoot ever owned the copyright. It certainly is not evidence that the particular oral transferring event in question actually took place.

Other than the Memorandum of Transfer (which as we have said cannot stand on its own), none of the proffered evidence, such as it is, would permit a jury to conclude that an oral transfer took place on October 5, 1999, as the Memorandum would have it and as Barefoot has argued.[4]

---

[4] We note that while Barefoot has not so argued, it is likely possible for a copyright transfer to be implied from conduct and then later validated in writing. *Eden Toys* suggested this possibility, *see* 697 F.2d at 36, and generally speaking the intent to transfer a right may be manifested through conduct. *See* Restatement (Second) of Contracts § 19 ("The manifestation of assent may be made wholly or partly by written or spoken words *or by other acts or by failure to act*.") (emphasis added); 6 Am. Jur. 2d Assignments § 83 ("Under the appropriate circumstances, a right may even be assigned without the execution of a formal assignment."). The Copyright Act does not foreclose this

Summary judgment was therefore appropriate, and we will affirm the District Court.

## IV

Before the case reached the summary judgment stage, the District Court dismissed the defendants' counterclaim for tortious interference with contractual relations pursuant to Rule 12(b)(6).

## A

The relevant provisions of the Restatement (Second) of Torts, §§ 766 and 766A, have not been abrogated by local law and thus control our analysis. 1 V.I.C. § 4. Section 766 requires, as an element of the cause of action, that the defendant cause a third party not to perform its obligations under a contract.[5] The District Court dismissed the

---

possibility: it provides that copyrights "may be transferred in whole or in part *by any means of conveyance* or by operation of law." 17 U.S.C. § 201(d)(1) (emphasis added). Plaintiff here has not, however, taken this route, and we will not consider whether it would have been availing.

We also observe that it might be possible for a court to recognize equitable exceptions to § 204(a)'s writing requirement. *See generally* Polk & Dalton, *supra*. But again, Barefoot has not advanced such an argument.

[5] Section 766 ("Intentional Interference with Performance of Contract by Third Person") reads in full:

One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third

22

counterclaim on the ground that it does not allege that anyone failed to perform any contract. Defendants/counterclaimants do not dispute this conclusion; rather, they argue that the District Court erred in relying solely on § 766, to the exclusion of § 766A.

Section 766A ("Intentional Interference with Another's Performance of His Own Contract") does not require a failure to perform:

> One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person, by preventing the other from performing the contract or causing his performance to be more expensive or burdensome, is subject to liability to the other for the pecuniary loss resulting to him.

The plaintiff can only recover, however, if the defendant's interference made it more expensive or burdensome for the *plaintiff* to perform. Distinguish the two sections thusly: § 766 allows a plaintiff to recover if a third party fails entirely to perform (because such nonperformance actually harms the plaintiff, whereas simply making a third party's life more difficult does not necessarily injure anyone else), while §

---

> person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract.

23

766A allows the plaintiff to recover if he himself was forced either to fail to perform under a contract or to perform under more expensive or burdensome circumstances (because the plaintiff's nonperformance or extra expense actually harms him).

The nature of the counterclaim makes clear that the defendants were attempting to invoke expense and delay, rather than nonperformance, as the origin of their damages. They allege that Barefoot "engaged in a course of action and communications to the Commissioner of the Virgin Islands Department of Planning and Natural Resources" that "was designed and calculated to delay and interfere with the permitting process for the construction" project, that in fact Barefoot's conduct did cause delays in permitting and construction, and that these delays led to monetary damages. The defendants emphasize that the gravamen of their harm is the delay in permitting and the consequent delay in construction. This allegation fulfills the elements of § 766A.[6]

B

Barefoot does not dispute this conclusion on the merits. Instead it contends that the defendants' § 766A argument is waived because they did not adequately raise it in

---

[6] We note that because a plaintiff can only recover under § 766A if the defendant's actions made the plaintiff's own contractual obligations more difficult or expensive, any relief obtained via this counterclaim should be limited to those parties whose own performance was hindered by the alleged delays in permitting.

24

the district court.[7]  We disagree.  While waiver ordinarily bars raising new arguments for the first time on appeal, this rule "is one of discretion rather than jurisdiction," *Selected Risks Ins. Co. v. Bruno*, 718 F.2d 67, 69 (3d Cir. 1983), and it may be "relaxed whenever the public interest . . . so warrants." *Rogers v. Larson*, 563 F.2d 617, 620 n.4 (3d Cir. 1977).  The waiver rule applies with greatest force "where the timely raising of the issue would have permitted the parties to develop a factual record." *In re Am. Biomaterials Corp.*, 954 F.2d 919, 927–28 (3d Cir. 1992).  The public interest is better served by addressing § 766A than by ignoring it.  The waiver rule serves two purposes: ensuring that the necessary evidentiary development occurs in the trial court, and preventing surprise to the parties when a case is decided on some basis on which they have not presented argument.  *See Hormel v. Helvering*, 312 U.S. 552, 556 (1941).  Neither of these aims would be furthered by invoking waiver here.  The posture of the case vitiates the first: evidence is irrelevant to a Rule 12(b)(6) motion, and we are presented only with the purely legal question whether Count V of the counterclaim states a cause of action.  And there can be no plausible claim of surprise or prejudice, because although the defendants' district court briefing invoked the wrong definition of the tort, the counterclaim itself alleges damages resulting from delay and added expense.  It thus plainly means to invoke the §

---

[7] The defendants' district court briefing on the subject quoted only cases requiring nonperformance, as per the § 766 definition. *See Pourzal v. Marriott Int'l, Inc.*, 2006 U.S. Dist. LEXIS 60229, at *7–8 (D.V.I. 2006) (requiring nonperformance); *Gov't Guar. Fund of Fin. v. Hyatt Corp.*, 955 F. Supp. 441, 452 (D.V.I. 1997) (quoting Restatement (Second) of Torts § 766).

25

766A definition of the tort.  We do not deem the § 766A argument waived.

C

Barefoot next argues that because the counterclaim was not filed until March 9, 2007, the applicable two-year limitations period bars claims that accrued before March 9, 2005. *See* 5 V.I.C. § 31(5)(A).  Because we are considering a motion to dismiss, our review is restricted to the face of the counterclaim. *See, e.g.*, *Robinson v. Johnson*, 313 F.3d 128, 135 (3d Cir. 2002); *Bethel v. Jendoco Constr. Corp.*, 570 F.2d 1168, 1174 (3d Cir. 1978) ("If the [statute of limitations] bar is not apparent on the face of the complaint, then it may not afford the basis for a dismissal of the complaint under Rule 12(b)(6)."). The Virgin Islands applies the discovery rule to tort suits, such that the statute of limitations is tolled "when the injury or its cause is not immediately evident to the victim." *Joseph v. Hess Oil V.I. Corp.*, 867 F.2d 179, 182 (3d Cir. 1989).  The date of discovery is not evident from the face of the counterclaim, which avers only that the defendants "discovered recently" that the plaintiffs had engaged in a tortious course of action.  Thus the pleading does not reveal when the limitations period began to run, and the statute of limitations cannot justify Rule 12 dismissal.

D

Because the tortious-interference counterclaim survives all the challenges that Barefoot has raised against it, we will vacate the District Court's dismissal.

26

V

Pursuant to 28 U.S.C. § 1367(c), the District Court, on its own motion, dismissed the counterclaims for breach of contract and of fiduciary duty, on the ground that no federal law claims remained in the case and that continuing to exercise supplemental jurisdiction over the territorial law claims was unwarranted.  The owners argue that jurisdiction is nonetheless proper on the basis of diversity of citizenship, 28 U.S.C. § 1332: Bunge and Friedberg, the only counterclaimants with an interest in the breach claims, are California citizens, and Barefoot is a Virgin Islands citizen.[8]

Generally speaking, the dismissal of the complaint "will not preclude adjudication of a counterclaim over which the court has an independent basis of jurisdiction." *Rengo Co. Ltd. v. Molins Mach. Co., Inc.*, 657 F.2d 535, 539 (3d Cir. 1981).  It is unimportant for this purpose that Roberts and Springline (both Virgin Islands citizens) are listed in the case caption (thus apparently destroying the complete diversity required by *Strawbridge v. Curtiss*, 7 U.S. (3 Cranch) 267 (1806)), because we are focused on whether jurisdiction exists with respect to the individual counterclaim, rather than with respect to the case as a whole.  Had they filed first, the owners could have invoked § 1332 to bring their breach claims in federal court in the first instance, and Barefoot could have filed its causes of action as counterclaims.  As things actually transpired, the owners were forced to file their

---

[8] Each of these counterclaims also places more than the $75,000 jurisdictional threshold in controversy.  *See* 28 U.S.C. § 1332(a).

27

breach claims as compulsory counterclaims, because they arose out of the same "transaction or occurrence" as Barefoot's complaint.[9]  Fed. R. Civ. P. 13(a).  The owners should not be deprived of a federal forum, to which they otherwise would have been entitled, because Barefoot's initial complaint named a non-diverse defendant who has no part of the owners' claims (except perhaps as a witness).

This conclusion does have an unusual consequence with respect to the tortious-interference counterclaim (discussed in Part IV, *supra*) asserted by all four defendants. Suppose that the owners had initiated the lawsuit by filing a complaint invoking diversity jurisdiction and asserting only the territorial law causes of action that presently remain before this Court.  Rule 24(b)(1)(B) would appear to permit Roberts and Springline to intervene in order to assert their tortious interference claims against Barefoot.  Those claims would need a basis of jurisdiction, and the only possibility (there being no diversity or federal question) would be

---

[9]  To be deemed part of the same "transaction or occurrence," a claim need only "bear[] a logical relationship to" the subject matter of the complaint. *Xerox Corp. v. SCM Corp.*, 576 F.2d 1057, 1059 (3d Cir. 1978).  Such a logical relationship exists where separate trials on each of the claims would "involve a substantial duplication of effort and time by the parties and the courts." *Id.*  "In short, the objective of Rule 13(a) is to promote judicial economy, so the term 'transaction or occurrence' is construed generously to further this purpose." *Transamerica Occidental Life Ins. Co. v. Aviation Office of Am., Inc.*, 292 F.3d 384, 389 (3d Cir. 2002).  This is clearly the case here, and there is no dispute that the counterclaims are compulsory.

supplemental jurisdiction under 28 U.S.C. § 1367. But in a case in which the district court's jurisdiction is based upon diversity, § 1367(b) denies the district courts supplemental jurisdiction "over claims by persons seeking to intervene as plaintiffs under Rule 24 . . . when exercising supplemental jurisdiction over such claims would be inconsistent with the jurisdictional requirements of" the diversity jurisdiction statute. The upshot is that if the owners had filed first, Roberts and Springline could not have piggybacked on their co-plaintiffs' diversity action.

Yet in the case that is actually before the Court, Roberts and Springline have not been made parties under any of the Rules subject to § 1367(b)'s jurisdiction-stripping provision[10]; rather, they are defendants and Rule 13(a) compulsory counterclaimants. *See United Capitol Ins. Co. v. Kapiloff*, 155 F.3d 488, 492–93 (4th Cir. 1998) ("[T]he limitation of § 1367(b) applies only to *plaintiffs'* efforts to join nondiverse parties.") As the Fourth Circuit observed, the limits on supplemental jurisdiction were "designed to prevent plaintiffs from circumventing the requirements of diversity." *Id*. at 493. But "because defendants are involuntarily brought into court, their joinders and impleaders were not deemed as suspect as those of the plaintiff, who is master of his complaint." *Id.* Roberts and Springline did not voluntarily avail themselves of the federal forum; they were named as defendants and were forced to raise their compulsory counterclaims or lose them. Accordingly all four defendants/counterclaimants can use the breach of contract and of fiduciary duty causes of action (which are properly

---

[10] That is, Rules 14, 19, 20, and 24.

29

before the court pursuant to Rule 13(a) and 28 U.S.C. § 1332) as anchor claims to which they may attach their resurrected tortious-interference-with-contract cause of action under the supplemental jurisdiction statute. Federal subject-matter jurisdiction thus attaches to all three territorial-law counterclaims.

## VI

To sum up: We will affirm the District Court's judgment as regards the summary judgment motion on the copyright claim. We will vacate the District Court's Rule 12(b)(6) dismissal of the tortious-interference-with-contract counterclaim and its dismissal of the breach of contract and of fiduciary duty counterclaims. We will remand those three counterclaims for consideration on the merits.

30