NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 13-2433
_____

MIMI MA,

Appellant

v.

WESTINGHOUSE ELECTRIC COMPANY, LLC
_____

On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. No. 11-cv-00970)
District Judge:  Honorable Terrence F. McVerry
_____

Submitted Under Third Circuit LAR 34.1(a)
March 6, 2014

Before:  RENDELL, SMITH and HARDIMAN, *Circuit Judges*.

(Opinion Filed:  March 18, 2014)
_____

OPINION
_____

HARDIMAN, *Circuit Judge*.

Mimi Ma appeals the District Court's summary judgment in favor of her former

employer, Westinghouse Electric Company, LLC. A Muslim woman who wears a

headscarf, Ma claimed that Westinghouse fired her because of gender and/or religious

discrimination and retaliation, in violation of Title VII and Pennsylvania state law.

Because we agree with the District Court that Ma did not present evidence from which a factfinder could conclude that Westinghouse's stated reasons for firing her were pretextual, we will affirm.

I

In November 2007, Ma began working for Westinghouse as Program Manager of Project Excellence, a company-wide program designed to improve project management practices, provide a standard set of project management tools, and increase standardization in project execution.

In April 2008, Ma received her first performance review, which was positive. Among other things, it mentioned that Ma had engaged with the job quickly, built a relationship network with counterparts, mentored project managers, had twice been asked to participate in companywide teams, kept senior management informed of her proposals, and was developing creative and worthy project management initiatives. Ma was praised for her energy and rated highly "based on the fact that she has displayed competencies that would seem to exceed expectations." App. at 285, 290. The review also noted that "it is too early to determine long term performance" and encouraged Ma to "continue to strive to make improvements in the Project Excellence program" and to "balance working on initiatives with solving day to day problems." *Id*. at 290.

In August 2008, Westinghouse created a new department, Nuclear Services Major Business Delivery, and appointed Michael Kaveney as its director. In announcing the reorganization, Westinghouse stated that Kaveney would "have responsibility for Project

2

Excellence and setting project management standards and processes globally"; Ma, meanwhile, would maintain her position as Project Excellence manager and report to Kaveney, instead of her previous supervisor in another department.

Kaveney was more hands-on than Ma's previous supervisors, and their relationship soon soured. Not long after the two had begun working together, Kaveney issued a written warning to Ma for showing a mock torture video[1] at a conference in August 2008. Soon after receiving the warning, Ma told Michele DeWitt, a female mentor who worked in a different division of the company, that Kaveney was rude and hostile to her. Throughout the fall and winter of 2008–09, Ma and Kaveney met regularly to discuss Kaveney's goals for Ma's projects. Kaveney conveyed to Ma his displeasure with what he perceived to be her lack of progress.

In February 2009, Ma again spoke with DeWitt about Kaveney. At DeWitt's recommendation, she then complained to Westinghouse's Human Resources department that Kaveney was rude and condescending, withheld resources and key information, excluded her from meetings, and assigned her responsibilities to others. A Human Resources director promptly met with Kaveney to discuss Ma's complaints. Thereafter, Kaveney made a spreadsheet to detail his interactions with Ma. In the spreadsheet, Kaveney noted that at the beginning of September 2008, he had assigned Ma three main

---

[1] Ma did not receive approval before presenting the video, which showed Ma yelling at and trying to strangle and beat a Westinghouse employee who had not providedher with the information she requested. "Your name is maggot to me until you fill out the project management documentation," she screamed at the employee at one point.

priorities, including "completion of the Project Excellence Report Card"; in October, he wrote that he reminded her that the Project Excellence Report Card should remain her top priority, and also noted two other priorities he wanted her to achieve before working on other issues. The spreadsheet detailed the many days on which Kaveney said he met with Ma to discuss uncompleted tasks and projects, and it also documented Kaveney's frustration with often not knowing where Ma was or what she was doing. Kaveney also stated in the spreadsheet that he had assigned some of Ma's work to other employees in the group "because I needed to get [it] done." Ma disputed the veracity of the spreadsheet, including the dates of some of the entries, a deadline Kaveney wrote that he had set, and whether Kaveney had previously told her a particular item was a priority.

Ma and Kaveney met with a Human Resources manager to discuss the complaints, but their interactions continued to be difficult. In a February 2009 email, Ma told DeWitt that she believed Kaveney had never intended to work with her and that he and another employee were essentially squeezing her out for reasons she did not understand. Ma claims that in response, DeWitt told her that perhaps Kaveney had "a problem with women or people with your religious background."[2] Ma also expressed disappointment in a letter to Human Resources that "the issues that I had brought to HR's attention have not been addressed" and stated that Kaveney had falsely accused her of missing deadlines after she complained to Human Resources about him. App. at 364.

---

[2] Dewitt denies ever saying this. Because we review the record in the light most favorable to Ma, we accept her version of this dispute over DeWitt's version.

4

In March 2009, Kaveney emailed Ma asking about where certain projects stood and to tell her he was interested in attending a project kick-off event. As it happened, the kick-off had occurred that morning, and Ma had not invited Kaveney. Unsatisfied with Ma's responses, Kaveney sent follow-up emails, stating, among other things: "Frankly, the tit for tat responses I'm receiving are unprofessional and they need to end." *Id*. at 296. In response, Ma stated that her replies had been "concise and completely professional," and that she had not invited Kaveney to the event because people in his position were not always present at kick-offs, and she would have invited him if she had known of his interest. *Id*. at 295-96. Kaveney sent the entire exchange to Human Resources, writing: "She never does anything wrong . . . This is going to deteriorate fast, how to coach, teach, train, and most importantly rely on someone who is never wrong? Venting . . . . " *Id*. at 297.

Kaveney's dissatisfaction with Ma's ability to meet deadlines continued, and the two continued to engage in contentious exchanges. For instance, in May, Ma accused Kaveney of making "unfair and false accusations" about a missed deadline and told him that he had been "clearly wrong." *Id*. at 379-80. At Ma's annual performance review, in June 2009, Kaveney gave Ma a low rating for falling below expectations and not meeting objectives. The review noted that Ma worked hard, offered many new ideas, was recognized as a project management professional, and was a competent presenter. However, it criticized her for numerous missed deadlines on key projects, poor communication (such as emails that were too long and numerous, and a lack of follow-up

5

and consistency), and perception of her leadership by executives as rushed, disorganized, and not visible or engaged. Kaveney also wrote: "Must be more open to coaching and criticism. I've seen nearly zero instances of acceptance and responsibility for any mistakes or lack of delivery." *Id.* at 301.

Thereafter, Kaveney placed Ma on a Performance Improvement Plan (Plan), which was to last through the end of September and contained an itemized list of performance objectives upon which Ma's continued employment depended. In addition to addressing the problems noted in Ma's review, the Plan described Ma's level of absenteeism as unacceptable. Ma refused to sign the Plan, arguing that it did not reflect her job performance, although she testified that she nonetheless tried to meet its objectives. In July, she prepared a point-by-point rebuttal of the Plan and claimed—for the first time in any document—that she believed she was being discriminated against. She also continued to meet with Kaveney and Human Resources pursuant to the Plan.

In August, Ma told Kaveney that she wanted to take a three-week vacation starting in September. Kaveney told her the timing was problematic, given the limited length of time left in the Plan, but nonetheless allowed her to take two weeks off. The company also extended the Plan deadline to October 15 to give Ma additional time. On October 27, 2009, Westinghouse terminated Ma's employment. In the termination letter, Kaveney wrote that Ma was fired for work performance not meeting expectations—including a lack of consistency in meeting deadlines, a lack of good judgment, and an "inability to consistently accomplish objectives through others"—and her failure to treat other

6

employees with dignity and respect, such as in "extremely disrespectful and borderline insubordinate" communications. Although management had tried to help Ma succeed, the letter stated, she was generally resistant to those efforts. Ma disputed this characterization of her work. A non-Muslim male took over her responsibilities.

Ma timely filed a complaint with the EEOC and received a right-to-sue letter. She filed this suit in July 2011, and the District Court granted summary judgment for Westinghouse in April 2013.

II[3]

We review the District Court's summary judgment de novo. *Burton v. Teleflex Inc.*, 707 F.3d 417, 425 (3d Cir. 2013). Summary judgment is proper when the moving party has established "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The court must view the facts in the light most favorable to the non-movant and draw all reasonable inferences in that party's favor. *Burton*, 707 F.3d at 425. However, to survive summary judgment, "the non-moving party must present more than a mere scintilla of evidence." *Id.* (quoting *Jakimas v. Hoffmann-La Roche, Inc.*, 485 F.3d 770, 777 (3d Cir. 2007)). Rather, "there must be evidence on which the jury could reasonably find for the [non-

---

[3] The District Court had jurisdiction under 28 U.S.C. §§ 1331 and 1343. We have jurisdiction under 28 U.S.C. § 1291.

7

movant]." *Id*. (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)).

III

Title VII prohibits employers from discharging "any individual . . . because of such individual's race, color, religion, sex or national origin."[4] 42 U.S.C. § 2000e–2(a)(1). Because Ma has not provided direct evidence of discrimination, we analyze her religion and sex discrimination and retaliation claim under the three-step framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–03 (1973). *See, e.g.*, *Burton v. Teleflex, Inc.*, 707 F.3d 417, 425–26 (3d Cir. 2013). Here, we will assume without deciding that the first two steps of the *McDonnell Douglas* test are satisfied, as the parties did before the District Court. Ma, a Muslim woman, was fired from a job for which she was qualified and replaced by a non-Muslim man. Westinghouse claims this was because Ma's performance failed to meet expectations and because she failed to treat other employees with dignity and respect.

Once the employer presents a legitimate, nondiscriminatory reason for the adverse employment action, as Westinghouse did, the burden of production shifts back to the plaintiff to provide evidence from which a factfinder could reasonably infer that the employer's proffered justification is merely a pretext for discrimination. *Fuentes v. Perskie*, 32 F.3d 759, 764–65 (3d Cir. 1994). To show pretext, "the plaintiff must point to

---

[4] "Claims under the [Pennsylvania Human Relations Act, 43 Pa. Cons. Stat. § 955] are interpreted coextensively with Title VII claims." *Atkinson v. Lafayette Coll.*, 460 F.3d 447, 454 n.6 (3d Cir. 2006).

some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Id*. at 764.

If, as here, the plaintiff's evidence relates to the credibility of the employer's justification, it "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions . . . that a reasonable factfinder could rationally find [the employer's reasons] unworthy of credence." *Id*. at 765 (internal quotation marks omitted). Because "the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, or competent," the plaintiff must do more than argue that the employer's decision was wrong or mistaken. *Id*. "[I]f a plaintiff has come forward with sufficient evidence to allow a finder of fact to discredit the employer's proffered justification, she need not present additional evidence of discrimination beyond her prima facie case to survive summary judgment." *Burton*, 707 F.3d at 427.

Ma argues that she provided sufficient pretext evidence to survive summary judgment. Westinghouse counters that the District Court properly granted summary judgment because Ma did not present any evidence from which pretext could be inferred. We agree with Westinghouse, because the "evidence" to which Ma points consists of her own conclusory statements and opinions, which are legally insufficient to support an inference of pretext.

We have rejected "out of hand" the notion "that the plaintiff can avoid summary judgment [on pretext grounds] simply by arguing that the factfinder need not believe the defendant's proffered legitimate explanations." *Fuentes*, 32 F.3d at 764. Rather, as the Supreme Court has made clear, the plaintiff must point to evidence from which a factfinder could reasonably infer "that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000). Even though on summary judgment we "construe the facts and draw inferences in the manner most favorable to the nonmoving party, it is equally axiomatic that a plaintiff's conclusory statements do not create an issue of fact." *Jackson v. E.J. Brach Corp.*, 176 F.3d 971, 985 (7th Cir. 1999). "An employee's self-serving statements about [her] ability . . . are insufficient to contradict an employer's negative assessment of that ability." *Id.*

The Eleventh Circuit's decision in *Alvarez v. Royal Atl. Developers, Inc.* is instructive on this point. 610 F.3d 1253 (11th Cir. 2010). There, the plaintiff, an accountant, alleged that she had been fired because of anti-Cuban discrimination. *Id.* at 1261. Her former employer responded that she had actually been fired for poor job performance. *Id.* at 1259–60. As here, the plaintiff disputed the criticisms of her job performance by offering specific rebuttals to job-related errors cited by the employer. *Id.* at 1260. Finding the plaintiff's rebuttal insufficient, the Eleventh Circuit opined:

> [T]he fact that she thinks more highly of her performance than her employer does is beside the point. The inquiry into pretext centers on the employer's beliefs and, to be blunt about it, not reality as it exists outside the decision maker's head. The question is not whether it was really [plaintiff's] fault that

assignments were not completed on time . . . or whether she was . . . rude to her colleagues and superiors . . . . The question is whether her employers were dissatisfied with her for these or other nondiscriminatory reasons, even if mistakenly or unfairly so, or instead merely used those complaints about [plaintiff] as cover for discriminating against her because of her Cuban origin.

*Id*. at 1266.

Stated otherwise, Title VII is not a vehicle for plaintiffs "to litigate whether they are, in fact, good employees." *Id*. Thus, in *Alvarez*, "[e]ven if [the plaintiff] could show [her job performance] was satisfactory by some objective standard, she has not raised a genuine issue of material fact as to the true reason she was fired." *Id*. at 1267. Rather, a plaintiff seeking to survive summary judgment "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions . . . that a reasonable factfinder could rationally find [the employer's reasons] unworthy of credence." *Fuentes*, 32 F.3d at 765. The District Court concluded that Ma came up short in this regard and we agree.

It is clear from the record that Ma and Kaveney did not get along, but it takes more than that to survive summary judgment in an employment discrimination case. Ma argues that she has presented a "plethora" of pretext evidence that contradicts the core of Westinghouse's stated reasons for firing her: poor job performance and the failure to treat other employees with deference and respect. But this "evidence" consists of her own assertions that Kaveney incorrectly assessed her performance and misrepresented their interactions and her work to Human Resources, including a six-page written explanation of why she disagreed with the company's decision to place her on a Plan and her own

11

assertions that she was not disrespectful. For instance, Ma argues that a jury could conclude Kaveney "fabricated the bases for his deficient evaluation of [her] work," but Ma's own statements alone support such a conclusion; there is nothing inherently suspicious about the fact that Kaveney compiled the timeline after speaking with Human Resources.

Ma also claims that the change in her performance review and rating from positive in 2008 to negative in 2009 gives rise to an inference of pretext. We are unpersuaded because "[p]retext is not established by virtue of the fact that an employee has received some favorable comments in some categories or has, in the past, received some good evaluations." *Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d 509, 528 (3d Cir. 1992). This is especially the case here, where Ma did not have a long history of favorable performance reviews at the company. The 2008 review was her first at Westinghouse and occurred after only five months on the job, and it not only contained areas for improvement that were also at issue in the 2009 evaluation, but specifically stated that it was too early to determine her long-term performance.

Finally, Ma claims that her opinions about Kaveney and her one positive review, when combined with her status as "the only Muslim employee on-site," also suggest pretext. We disagree. As Westinghouse notes, any individual who was the only member of a protected class in a workplace and suffered an adverse employment action could automatically establish pretext if Ma were correct on this point. Ma argues that a male non-Muslim previously responsible for some of her job duties was treated more

favorably, but she has not produced evidence to show he was similarly situated or is an acceptable comparator.

IV

Although a plaintiff can survive a motion to dismiss with plausible allegations, summary judgment can be avoided only by proffering evidence sufficient to create a material dispute of fact. *Barefoot Architect, Inc. v. Bunge*, 632 F.3d 822, 826 (3d Cir. 2011). Ma contends that "a factfinder is more likely to credit Ma's version of events over that of her employer due to the steadfastness of her defense against Kaveney's charges." Forceful insistence on the rightness of one's position does not transform it into evidence, however. Even if Kaveney's assessment of Ma's performance was mistaken, she has not presented evidence from which a factfinder could find it was incoherent or contradictory. Because Ma has failed to produce evidence from which pretext could be inferred, summary judgment was appropriate. We will affirm the order of the District Court.