

Villanova University School of Law Digital Repository

2009 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

3-27-2009

# Wendell Gorum v. Allen Sesoms

Precedential or Non-Precedential: Precedential

Docket No. 08-1741

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2009

Recommended Citation

"Wendell Gorum v. Allen Sesoms" (2009). *2009 Decisions*. Paper 1611.
http://digitalcommons.law.villanova.edu/thirdcircuit_2009/1611

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2009 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 08-1741

WENDELL GORUM, Ph.D.,

Appellant

v.

ALLEN L. SESSOMS, Ph.D., Board of Trustees
of Delaware State University

Appeal from the United States District Court
for the District of Delaware
(D.C. Civil Action No. 1-06-cv-00565)
District Judge: Honorable Gregory M. Sleet

Submitted Under Third Circuit LAR 34.1(a)
January 30, 2009

Before: SCIRICA, Chief Judge, AMBRO,
and SMITH, Circuit Judges

(Opinion filed: March 27, 2009)

Gregg L. Zeff, Esquire
Niev E. Lindbloom, Esquire
Frost & Zeff
7 North Christopher Columbus Boulevard
Pier 5 at Penn's Landing, 2nd Floor
Philadelphia, PA 19106-0000

  Counsel for Appellant

Robert L. Duston, Esquire
Saul Ewing
2600 Virginia Avenue, N.W.
Suite 1000 – The Watergate
Washington, DC 20037-0000

  Counsel for Appellees

---

OPINION OF THE COURT

---

AMBRO, <u>Circuit Judge</u>

  Wendell Gorum, Ph.D., appeals the District Court's grant of summary judgment in favor of Allen Sessoms, Ph.D., President of Delaware State University ("DSU"), and the DSU

Board of Trustees (the "Board").[1] Gorum alleged that Sessoms retaliated against him for engaging in speech and association protected by the First Amendment to the United States Constitution.[2]  For the reasons that follow, we affirm the judgment of the District Court.

## I.  Factual and Procedural Background

DSU is a public institution governed by the Board. Sessoms served as its President from 2003 until 2008.  Gorum was a tenured professor at DSU from 1989 until his dismissal in 2005.  He chaired the Mass Communications Department from 1997 until 2004.  As a DSU professor, Gorum sat on various administrative committees, including the Faculty Senate and Student Affairs Committee, and served as an advisor to the DSU chapter of the Alpha Phi Alpha fraternity.

In January 2004, the DSU registrar began an audit of recently submitted grade changes after learning of a grade

---

[1] For procedural convenience, the parties stipulated to naming and serving the Board in lieu of each Board member. *See Gorum v. Sessoms*, No. 06-565, 2008 WL 399641, at *1 n.1 (D. Del. Feb. 12, 2008).

[2] Gorum did not allege that any action by the Board was retaliatory.  Rather, he brought suit against each Board member in his or her individual capacity solely for prospective injunctive relief.  *See id.*

irregularity in the transcript of a student athlete. Through this audit, the registrar determined that Gorum, without the professor-of-record's permission, had changed withdrawals, incompletes, and failing grades to passing grades for 48 students in the Mass Communications Department. When confronted with these findings, Gorum admitted his actions, but asserted that he had received sufficient authorization to make the changes. He also claimed that grade alterations by department chairs were common at DSU. Unconvinced, Sessoms, in consultation with other administrators at DSU, began dismissal proceedings and suspended Gorum.

Gorum responded by exercising his right under the Collective Bargaining Agreement between DSU and its faculty to request a hearing before an Ad Hoc Disciplinary Committee. The Committee's review included pre-hearing discovery, extensive hearings, and post-hearing briefing with attorney representation. The Committee detailed its findings in a report, which concluded that "DSU has proven by clear and convincing evidence" that Gorum violated the Collective Bargaining Agreement. The report specifically noted that Gorum

> [1] misrepresented information on [change-of-grade forms] by signing as instructor for courses that he did not actually teach . . . [; 2] did not obtain the permission or approval of the instructor-of-record to execute modification[s] of grade[s] . . . [; 3] knew that DSU practices and

4

procedures did not include signing for an instructor-of-record without indicating this fact . . . [; 4] arbitrarily assigned grades to students for courses they were not registered in . . . [; 5] retroactively registered and assigned grades to students for classes taught by other instructors . . . [; 6] awarded grades to some students in classes that the students had never attended . . . [; and 7] practiced favoritism, whereby selected students, especially athletes[,] obtained grades in core courses in their major, without necessarily completing required course material.

The report also remarked that "Dr. Gorum's actions undermine the very tenets of the educational profession and rise to a level deserving condemnation by the academic community."

Despite the damning nature of these findings, the Committee did not recommend terminating Gorum because of what it labeled "an atmosphere of pervasive laxity, lack of rule enforcement, and the absence of accountability at all levels [of DSU] that perpetuated and encouraged random and uncontrolled manipulations of student grades." Within this atmosphere, the Committee believed that "Dr. Gorum's case is the tip of the iceberg, and he is, in fact, the scapegoat (albeit a blamable scapegoat)." The Committee therefore recommended that Gorum face only a two-year unpaid suspension, loss of his chair position, and a probationary period thereafter.

5

Taking note of the Committee's views, President Sessoms nevertheless proceeded with a dismissal action against Gorum. Writing to the Board, he opined that terminating Gorum's employment was "the only appropriate sanction" for his "unprofessional" and "highly reprehensible" conduct. Sessoms addressed the Committee's concern that Gorum was a scapegoat by stating: "If there are other professors who have engaged in similar conduct, those cases will be addressed. But nothing in the allegations of past practice comes anywhere close to the reprehensible actions of Dr. Gorum."

The Board, exercising its authority under § 10.4.14 of the Collective Bargaining Agreement, unanimously agreed with Sessoms and voted to dismiss Gorum. Before making its decision, the Board reviewed the report of the Committee, the parties' post-hearing briefs, and had access to the transcript and exhibits from the hearings. Gorum was also given an opportunity to address the Board, which he did not accept.

Nearly two years after his dismissal, Gorum filed suit in the United States District Court for the District of Delaware. He claimed that Sessoms's decision to recommend dismissing him—and not merely suspending him as the Committee had advised—was a retaliatory action intended to punish him for engaging in speech and association protected by the First Amendment. Gorum specifically alleged that Sessoms recommended terminating his employment because of views he expressed in three instances.

First, Gorum stated that his dismissal was retaliation for his objection to the selection of Sessoms as University President in 2003. Gorum explained that he had voiced opposition before the Faculty Senate to selecting Sessoms and ending the search for University President, and he suggested that Sessoms was aware of his position.

Second, Gorum claimed that Sessoms had punished him for acting as an advisor to DaShaun Morris, an NCAA All-American Division I-AA football player who violated DSU's zero-tolerance policy against weapons possession in 2002. Gorum stated that his authorship of the DSU disciplinary code had made him "the *de facto* advisor to all DSU students with disciplinary problems," including Morris. Gorum's Op. Br. at 4. He noted that he helped Morris draft an appeal letter, retained an attorney for Morris, and served as an advisor at Morris's disciplinary hearing. He also used his position as department chair to intercede on Morris's behalf with the then-President of the University, William DeLauder, Ph.D. Gorum argued that these acts placed him out of favor with University administrators, including Sessoms.

Third, Gorum contended that the decision to dismiss him resulted from his recission of an invitation to Sessoms to speak at the 2004 Alpha Phi Alpha Martin Luther King, Jr. Prayer Breakfast. According to his complaint, Gorum served as chair of the event's speakers committee and instructed a member of the committee to revoke an invitation to speak that the

7

committee member mistakenly made to Sessoms after the committee already had selected another speaker.  Gorum noted that he later heard from several people that Sessoms "was upset about the cancellation."  Gorum's Op. Br. at 6.

The District Court rejected Gorum's claims and granted summary judgment in favor of Sessoms and the Board.  The Court, after concluding that Gorum's allegations were timely and properly pleaded, held that Gorum failed to "adduce sufficient record evidence to raise a genuine issue that: (1) his activities were protected by the First Amendment, and (2) the protected activity was a substantial factor in the alleged retaliatory action."  *Gorum*, 2008 WL 399641, at *3 (citing *Hill v. Borough of Kutztown*, 455 F.3d 225, 241 (3d Cir. 2006)).  In particular, the Court determined that the three speech-related instances presented by Gorum occurred within the scope of his "official duties" and were not protected by the First Amendment.  It also ruled that Gorum had failed to create a genuine issue that Sessoms knew of his speech during the presidential selection process or his involvement with Morris's appeal.  *See id.* at *3–6.  The Court held as well that Sessoms and the Board had shown that "Sessoms would have recommended Gorum's termination to the Board even if Gorum had not engaged in any activity protected under the First Amendment."  *Id.* at *6.  This appeal followed.

## II.    Jurisdiction and Standard of Review

The District Court had jurisdiction under 28 U.S.C. §§ 1331 and 1343. We have jurisdiction under 28 U.S.C. § 1291.

When the District Court grants a motion for summary judgment, our review is plenary. *See Elsmere Park Club, L.P. v. Town of Elsmere*, 542 F.3d 412, 416 (3d Cir. 2008). Summary judgment is appropriate when no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). We resolve all factual doubts and draw all reasonable inferences in favor of the nonmoving party. *See DL Res., Inc. v. FirstEngergy Solutions Corp.*, 506 F.3d 209, 216 (3d Cir. 2007). We may affirm or vacate the District Court's judgment on any grounds supported by the record. *In re Teleglobe Commc'ns Corp.*, 493 F.3d 345, 385 (3d Cir. 2007).

## III.    Discussion

To state a First Amendment retaliation claim, a public employee plaintiff must allege that his activity is protected by the First Amendment, and that the protected activity was a substantial factor in the alleged retaliatory action. *See Hill*, 455 F.3d at 241. "The first factor is a question of law; the second factor is a question of fact." *Id*. If these two elements are satisfied, the burden shifts to the defendants to demonstrate that

the same action would occur if the speech had not occurred. *See Green v. Phila. Hous. Auth.*, 105 F.3d 882, 885 (3d Cir. 1997).

Reflecting the three-part nature of this test, Gorum argues that the District Court erred by holding that: (1) his assistance to Morris and chairmanship of the speakers committee for the Alpha Phi Alpha Martin Luther King, Jr. Prayer Breakfast were not activities protected by the First Amendment; (2) his claimed protected activities were not substantial factors behind Sessoms's recommendation to terminate his employment; and (3) Sessoms would have recommended dismissing him even absent his alleged protected activities.[3] We disagree.

### A. Gorum's Speech Was Not Protected by the First Amendment

A public employee's statement is protected by the First Amendment when, "(1) in making it, the employee spoke as a citizen, (2) the statement involved a matter of public concern, and (3) the government employer did not have 'an adequate justification for treating the employee differently from any other

---

[3] Gorum does not contest the District Court's holding that his speech concerning the selection of a new University President was neither protected under the First Amendment nor a substantial factor in, or but for cause of, his termination. *See Gorum*, 2008 WL 399641, at *5; Gorum's Op. Br. at 29–31, 34–38. Abandonment of these issues waives them on appeal. *See Kopec v. Tate*, 361 F.3d 772, 775 n.5 (3d Cir. 2004).

member of the general public' as a result of the statement he made." *Hill*, 455 F.3d at 241 (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006)).  Gorum cannot satisfy this test.  He particularly is unable to prove that he conducted his allegedly protected activities as a citizen or that he spoke on a matter of public concern.

### i.      Gorum Did Not Speak as a Citizen

The Supreme Court held in *Garcetti* that a public employee does not "speak as a citizen" when he makes a statement pursuant to his "official duties."  547 U.S. at 421.  "Restricting speech that owes its existence to a public employee's professional responsibilities," the Court reasoned, "does not infringe any liberties the employee might have enjoyed as a private citizen."  *Id.*  Put another way, the First Amendment does not shield the consequences of "expressions employees make pursuant to their professional duties."  *Id.* at 426.

Gorum asserts that the assistance he provided to Morris was protected citizen speech because it went beyond his specified responsibilities in the Collective Bargaining Agreement.[4]  This assertion is misguided.  As the Supreme

---

[4] Gorum's Amended Complaint referred to some of his activities to assist Morris as protected "association."  The District Court considered the association claim, but declined to

11

Court has stated, the "proper inquiry" into what are an individual's official duties "is a practical one." *Garcetti*, 547 U.S. at 424. "Formal job descriptions often bear little resemblance to the duties an employee actually is expected to perform . . . ." *Id.* We have held as well that a claimant's speech might be considered part of his official duties if it relates to "special knowledge" or "experience" acquired through his job. *See Foraker v. Chaffinch*, 501 F.3d 231, 240 (3d Cir. 2007).

Under these prescriptions, Gorum's assistance of Morris came within the scope of his official duties. It was Gorum's

---

address whether it was protected activity. *See Gorum*, 2008 WL 399641, at *6. On appeal, Gorum makes only a passing reference to the speech/association distinction. *See* Gorum's Op. Br. at 34. This waives the issue. *See Laborers' Intern. Union of N. Am., AFL-CIO v. Foster Wheeler Energy Corp.*, 26 F.3d 375, 398 (3d Cir. 1994) ("An issue is waived unless a party raises it in its opening brief, and for those purposes 'a passing reference to an issue . . . will not suffice to bring that issue before this court.'" (quoting *Simmons v. City of Phila.*, 947 F.2d 1042, 1066 (3d Cir. 1991) (plurality opinion) (Becker, J.), *cert. denied*, 503 U.S. 985 (1992))). Even had Gorum not waived the issue, we note that his associational claim is linked closely enough with his free-speech claim to justify application of the citizen-speech and public-concern requirements. *See Sanguigni v. Pittsburgh Bd. of Public Educ.*, 968 F.2d 393, 400 (3d Cir. 1992).

special knowledge of, and experience with, the DSU disciplinary code that made him "*de facto* advisor to all DSU students with disciplinary problems." Gorum's Op. Br. at 4. It was through his position as a professor and department chair, moreover, that Gorum was able to aid Morris and serve as his advisor at a disciplinary hearing. *See* App. at A173 (noting that, according to the DSU Student Handbook, only a "member of the faculty, staff or student body of the University can serve as an advisor" at a disciplinary hearing). Gorum used University resources to assist Morris, *see id.* at A305, and emphasized the responsibility that he felt as author of the disciplinary code to help students facing punishment. *See id.*[5]

Gorum's revocation of Sessoms's invitation to speak at

---

[5] When asked why he opted to assist Morris, Gorum stated:

> A: I have always done that. Students with difficult cases always came to me for assistance.
> Q: Is that something that you felt important to do as a chair and tenured professor?
> A: Yeah, I chaired the Student Affairs Committee, which was responsible for the drafting [of] the judiciary procedures. And from that perspective, I did it because I had been chair of the committee that drafted it and I knew it. And if I didn't assist students, then how could I encourage other faculty members to do the same?

the Alpha Phi Alpha fraternity's Martin Luther King, Jr. Prayer Breakfast likewise is not protected citizen speech. The Faculty Senate Bylaws include within the responsibilities of professors aiding "faculty and alumni involvement with student organizations and clubs as mentors and advisors." Gorum's chairmanship of the speakers committee for the fraternity's Prayer Breakfast fits within these responsibilities. His withdrawal of Sessoms's invitation to speak was not therefore made as a citizen benefitting from the protection of the First Amendment. It was made as a public employee engaging in his official duties.

In determining that Gorum did not speak as a citizen when engaging in his claimed protected activities, we are aware that the Supreme Court did not answer in *Garcetti* whether the "official duty" analysis "would apply in the same manner to a case involving speech related to scholarship or teaching." 547 U.S. at 425. We recognize as well that "[t]here is some argument that expression related to academic scholarship or classroom instruction implicates additional constitutional interests that are not fully accounted for by . . . customary employee-speech jurisprudence." *Id.* But here we apply the official duty test because Gorum's actions so clearly were not "speech related to scholarship or teaching," *id.*, and because we believe that such a determination here does not "imperil First Amendment protection of academic freedom in public colleges

14

and universities." *Id.* at 438 (Souter, J. dissenting).[6]

[6] The full implications of the Supreme Court's statements in *Garcetti* regarding "speech related to scholarship or teaching" are not clear. *See Emergency Coal. to Defend Educ. Travel v. United States Dep't of the Treasury*, 545 F.3d 4, 16–18 (D.C. Cir. 2008) (Edwards, J. concurring); Judith Areen, *Government as Educator: A New Understanding of First Amendment Protection of Academic Freedom and Governance*, 97 Geo. L.J. ___ (forthcoming Apr. 2009). As a result, federal circuit courts differ over whether (and, if so, when) to apply *Garcetti*'s official-duty test to academic instructors. *Compare Renken v. Gregory*, 541 F.3d 769, 773–75 (7th Cir. 2008) (granting summary judgment to a public university because a professor's complaints regarding "the proper administration of an educational grant fell within the scope of [his] teaching duties"), *with Lee v. York County Sch. Div.*, 484 F.3d 687, 695 (4th Cir. 2007) (declining to apply *Garcetti* in determining whether a high school teacher's bulletin board postings constituted protected speech under the First Amendment).

Where *Garcetti*'s official duty test does not apply to a public instructor's speech "related to scholarship or teaching," courts apply the traditional First Amendment protected speech analysis established in *Pickering v. Bd. of Educ.*, 391 U.S. 563, 569 (1968), and *Connick v. Myers*, 461 U.S. 138, 143–44 (1983). *See Borden v. Sch. Dist. of the Twp. of East Brunswick*, 523 F.3d 153, 167–71 (3d Cir. 2008). This is a two-step analysis. The first considers whether the employee's speech was on a matter of public concern. *Connick*, 461 U.S. at 146. If so, the second requires balancing "between the interests of the [employee], as a citizen, in commenting upon matters of public

### ii. Gorum's Speech Was Not on a Matter of Public Concern

"Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Connick v. Myers*, 461 U.S. 138, 147–48 (1983); *see also Miller v. Clinton County*, 544 F.3d 542, 548 (3d Cir. 2008). "The content of speech on a matter of public concern generally addresses a social or political concern of the community," thus implicating significant First Amendment concerns. *Borden v. Sch. Dist. of the Twp. of East Brunswick*, 523 F.3d 153, 169–70 (3d Cir. 2008); *see also id.* at 170 (providing examples of cases involving speech that addressed matters of public concern). "In contrast, speech on matters of purely private concern is of less First Amendment concern" because "[t]here is no threat to the free and robust debate of public issues; there is no potential interference with a meaningful dialogue of ideas concerning self-government; and there is no threat of liability causing a reaction of self-censorship by the press." *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 759–60 (1985) (internal quotations omitted).

Gorum's assistance of Morris did not involve a matter of

concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering*, 391 U.S. at 568.

16

public concern. Instead, his "speech" during Morris's disciplinary hearing related to the personal grievance of one student. There is no evidence in the record that Gorum even made a public statement. There is no proof that he thought any public policy issues were at stake. And assuming that Gorum even raised matters of public concern in assisting Morris, "[w]e cannot 'cherry pick' something that may impact the public while ignoring the manner and context in which that statement was made or that public concern expressed." *Miller*, 544 F.3d at 550. Morris's appeal, as Gorum stated, "was about his future as a professional athlete." App. at A307. It did not pertain to a public concern.

Gorum's revocation of President Sessoms's invitation was also not a matter of public concern protected by the First Amendment because it did not touch on "broad social or policy issues" or "implicate[] the discharge of public responsibilities by an important government office, agency, or institution." *Sanguigni v. Pittsburgh Bd. of Pub. Educ.*, 968 F.2d 393, 397 (3d Cir. 1992). The errant invitation was made in private, as was its recission. The only message we conjure the revocation conveyed was that the speakers committee for the Prayer Breakfast was unorganized.

> **B.**     **Gorum's Speech Was Not a Substantial Factor Behind Sessoms's Allegedly Retaliatory Decision**

17

Setting aside Gorum's inability to prove the protected nature of his speech, he also cannot show that his remarks and actions were substantial factors behind President Sessoms's alleged retaliatory decision. As the District Court found, no evidence exists that Sessoms had any knowledge of Gorum's involvement in Morris's disciplinary proceeding when he made his recommendation. *See Gorum*, 2008 WL 399641, at *6. Indeed, Gorum admitted that he could only infer that Sessoms knew of his involvement with Morris. *See* App. at A304.[7]

---

[7] The specific line of questions and answers on this point read:

> Q: . . . Has anybody told you the president knows that you were involved in Mr. Morris' lawsuit?
> . . . .
> A: Not that I can remember, no.
> Q: Have you ever spoken to the president . . . about Mr. Morris?
> A: No.
> Q: Have you seen anything in writing suggesting that the president knew of your involvement in Mr. Morris' lawsuit?
> . . . .
> A: No.
> Q: Was your name ever publicly connected with Mr. Morris' lawsuit . . . ?
> A: No, not directly. . . .

The same is true of the Prayer Breakfast invitation. Sessoms testified that he was not aware of its revocation by Gorum, *see id.* at A248, and the latter offered no reliable evidence to rebut that assertion. *See id.* at A481.

In this context, Gorum's claimed protected activities hardly seem substantial factors in Sessoms's recommendation. *See Ambrose v. Twp. of Robinson*, 303 F.3d 488, 493 (3d Cir. 2002) ("It is only intuitive that for protected conduct to be a substantial or motivating factor in a decision, the decisionmakers must be aware of the protected conduct.").

### C. Sessoms Would Have Recommended Terminating Gorum Irrespective of His Speech

As a final matter, we agree with the District Court's conclusion that Sessoms "would have recommended Gorum's termination to the Board even if [he] had not engaged in any activity protected under the First Amendment." *Gorum*, 2008 WL 399641, at *6. Gorum's disregard for the academic integrity of DSU and his violation of students' rights to an impartial educational experience was "highly reprehensible, and warrant[ed] the condemnation of the academic community at large." App. at A112. Acknowledging this fact, Sessoms never wavered from his position that Gorum deserved dismissal. *See id.* at A252, A256, A372–73. Sessoms's view was shared by the unanimous Board, as well as other professors and administrators, and there is no evidence that he would have

19

recommended a lesser reprimand had Gorum not assisted Morris or rescinded Sessoms's invitation to speak at the Prayer Breakfast. Thus, even absent the findings in the sections above, Gorum's claims fail.

## IV.     Conclusion

Gorum's arguments are, we deem, makeweight attempts to counter his dismissal for doctoring student grades. Gorum violated a key part of the academic code, and this justified his termination notwithstanding the normal protections of tenure. We thus affirm the District Court's grant of summary judgment in favor of Sessoms and the Board.