**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 10-4173
_____


SHERMAN ABRAMS,

Appellant

v.

PORT AUTHORITY TRANS-HUDSON CORPORATION, CYNTHIA BACON,
STEVEN ABRAMOPOLOUS, AND ROBERT REICH


_____


On Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 2-07-cv-04975)
District Judge:  Honorable Stanley R. Chesler

_____


Submitted under Third Circuit LAR 34.1(a)
on July 15, 2011


Before:  RENDELL, SMITH, and ROTH, Circuit Judges

(Opinion filed: September 20, 2011)

## O P I N I O N

**ROTH**, <u>Circuit Judge</u>:

## I. **Introduction**

Sherman Abrams appeals summary judgment on his racial discrimination and First Amendment retaliation claims against the Port Authority Trans-Hudson Corporation (PATH) and several of its employees. He contends that the District Court overlooked evidence that PATH's basis for terminating him was pretextual and retaliatory. Because Abrams did not offer sufficient evidence to present a triable issue of fact on his claims, we will affirm the judgment of the District Court.

## II. **Background**[1]

PATH is a governmental entity created by an interstate compact between the States of New York and New Jersey, with the approval of Congress. *See* 42 Stat. 174 (1921); N.J. Stat. Ann. § 32:1-1 *et seq.*; N.Y. Unconsol. Laws § 6401 *et seq.*. PATH operates a transit rail system connecting New York and New Jersey across the Hudson River. Abrams, an African American, was employed by PATH for thirteen years—from February 1992 to August 2005—in a position designated by PATH as "Trackman I." As a Trackman I, Abrams worked on PATH's railroad tracks, and his tasks included lifting, moving, and placing railroad spikes, ties, and rails. As a result, PATH required that

---

[1] Because we write only for the parties, we briefly summarize the undisputed facts, drawing all inferences in favor of Abrams, the non-moving party. *See Barefoot Architect, Inc. v. Bunge*, 632 F.3d 822, 826 (3d Cir. 2011).

Abrams be able to walk in track areas, climb wall ladders, stand for long periods of time (two to three hours), crouch for up to 30 minutes, lift material weighing up to 100 pounds, and handle heavy equipment weighing 45-90 pounds.

Throughout Abrams's employment he was obese, and from at least 1998 he also suffered from chronic cellulitis and phlebitis. Due to these medical conditions, Abrams was absent from work for protracted periods of time: PATH attendance records indicate that he was absent on paid leave for 282 weeks, or almost 5½ of the 13 years he worked at PATH. Over the course of his employment, Abrams also repeatedly complained about his treatment at PATH, raising union grievances, filing complaints with the EEOC, and bringing unrelated lawsuits against PATH.

Abrams's orthopedist, Dr. Lee, was deposed in one of these lawsuits in January 2005 and testified that Abrams should not be in a job that required a lot of walking and standing or that required walking on uneven surfaces. After learning of this testimony, Paul Moreno, a superintendent at PATH, requested an evaluation of whether Abrams was able to perform the duties of a trackman. Moreno also noted that, since January 1, 2004, Abrams had been out sick for 140 days, and that Abrams had given notice that he would continue on sick leave until June 2005.

On March 8, 2005, Dr. Jaffe, an orthopedic surgeon, examined Abrams for PATH. Dr. Jaffe diagnosed Abrams with a torn meniscus and concluded that he was able to hold "a very sedentary position," but could not perform tasks such as "walking, climbing stairs, and getting up and down from a seated position." Abrams was then evaluated by PATH's Office of Medical Services (OMS) and Dr. Duke, PATH's Chief Medical

3

Officer, reported that Abrams was "fit for duty as a Trackman with a permanent restriction of 'no lifting over 50 pounds, no squatting, bending or climbing; no prolonged standing or walking – not utilized.'" In April 2005, Dr. Lee responded to Dr. Jaffe's opinion and agreed with him that Abrams should "avoid excessive stair climbing," and "should not walk on uneven surfaces that he does when working as a trackman." But Dr. Lee also opined that Abrams "is fit for duty. He may return to duty with the restrictions of not going back as a trackman. He can work regular duty on floors that have even surfaces if this is available." A week after Dr. Lee's report, Dr. Jaffe reported to Dr. Duke that he had reviewed the job requirements for a trackman and had concluded "with a high degree of medical certainty" that Abrams "will not be able to perform the full duties of a Trackman I." Abrams was then re-evaluated by OMS and Dr. Duke concluded that "he is never fit to perform the duties of Trackman I."

In June 2005, at the request of Abrams's union, the Transport Workers Union of America (TWU), PATH convened an Employee Review Committee to meet with Abrams concerning other job opportunities at PATH. Abrams expressed interest in each of the six alternative positions identified by the Committee but, based on his medical condition, Abrams was "not capable of performing the full duties" for any of the positions. TWU and PATH then agreed to convene a Board of Doctors to determine whether Abrams was medically disqualified from holding the position of Trackman I. PATH designated Dr. Duke to represent it on the Board and TWU designated Dr. Lee as its representative. Dr. Duke and Dr. Lee were then required to agree on a third doctor to serve on the Board, and after exchanging several names, ultimately agreed on Dr. Schob. Dr. Dukes had

4

proposed Dr. Schob and had certified that he "is not associated with PATH or me in any matter." In September 2005, Dr. Schob examined Abrams, consulted his medical records, and provided a detailed medical report, concluding that Abrams was not medically fit for the position of Trackman I. The Board concluded by a 2-1 vote that Abrams was not medically fit for the position of Trackman I.

Two months later, after a number of telephone and in-person contacts from Abrams, Dr. Schob admitted that, unbeknownst to Dr. Dukes and Dr. Lee, he had performed permanency evaluations on PATH employees through a company called Procura. Dr. Schob then wrote a letter to Dr. Duke in which he explained that he felt "it was necessary to alter my final conclusions with regards to [Abrams's] work status" and that he felt that Abrams "should be allowed to return to work at his usual and customary activities as a Trackman 1." On the basis of this letter, TWU requested that Abrams be reinstated. PATH refused and a Special Board of Adjustment was convened to arbitrate their dispute. The Adjustment Board considered Dr. Schob's original and subsequent reports and in a thorough, detailed opinion concluded that Abrams's claim for reinstatement based on Dr. Schob's revised opinion was "without merit."

Abrams then sued PATH and several of its employees in New Jersey state court, asserting numerous claims for relief under both federal and New Jersey law. These included two claims brought under 42 U.S.C. § 1983, alleging that PATH had discriminated against Abrams on the basis of his race, in violation of the Fourteenth Amendment, and retaliated against him for exercising his free speech rights, in violation of the First Amendment. The case was removed to the United States District Court for

5

the District of New Jersey. The District Court dismissed a number of Abrams's claims and the parties proceeded with discovery on the remaining claims.

At the close of discovery, PATH moved for summary judgment, first on Abrams's Fourteenth Amendment claim and then later on his First Amendment claim. In separate orders, the District Court granted both motions. With respect to the Fourteenth Amendment claim, the court assumed *arguendo* that Abrams had established a *prima facie* case of discrimination but found that Abrams had not presented sufficient evidence that PATH's stated reason for terminating him was pretextual. With respect to Abrams's First Amendment retaliation claim, the District Court found that Abrams had failed to present any evidence that his termination was the result of his protected speech. The court further noted that both of Abrams's claims were deficient as to PATH because he had not presented any evidence of an unconstitutional policy or custom that would support a finding of liability under *Monell v. Department of Social Services*, 436 U.S. 658 (1978).[2]

## III.  Discussion

We review *de novo* the District Court's grant of summary judgment. *Barefoot Architect, Inc. v. Bunge*, 632 F.3d 822, 826 (3d Cir. 2011). "While '[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor' in determining whether a genuine factual question exists, summary judgment should not

---

[2] The District Court also granted summary judgment on Abrams's Equal Protection claim based on disability discrimination. Abrams does not appeal this ruling.

be denied unless there is sufficient evidence for a jury to reasonably find for the nonmovant." *Id.* (citations omitted).

The District Court properly granted summary judgment on Abrams's First Amendment retaliation claim against the remaining individual defendants.[3] Like the District Court, we assume *arguendo* that Abrams's complaints about discriminatory practices at PATH were protected speech under the First Amendment and consider whether he presented evidence that his speech was a "substantial factor" in his termination. *See Gorum v. Sessoms*, 561 F.3d 179, 184 (3d Cir. 2009). Abrams argues that the District Court overlooked evidence of temporal proximity and a "pattern of antagonism" that supported such an inference. But he has not provided—either before the District Court or this Court—any indication of the timing of his protected speech or how this speech related to retaliatory action against him, both of which are essential to a showing of temporal proximity or pattern of antagonism. *See Abramson v. William Paterson College of N.J.*, 260 F.3d 265, 288 (3d Cir. 2001); *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 281 (3d Cir. 2000).

Summary judgment was also proper on Abrams's Equal Protection claim based on alleged racial discrimination. Abrams first contends that the District Court erred in

_____

[3] Summary judgment was also proper on Abrams's *Monell* claims against PATH. As a state agency, PATH can only be held liable under § 1983 for Abrams's termination if the termination arose from an unconstitutional policy or custom of PATH. *Brown v. City of Pittsburgh*, 586 F.3d 263, 292 (3d Cir. 2009) (citing *Monell*, 436 U.S. at 694). Abrams contends that Dr. Duke's improper selection of Dr. Schob as a "neutral" doctor despite Dr. Shob's connection to PATH supports an inference that PATH had a policy of deliberate indifference to constitutional rights. This inference is dubious at best, and falls well short of the exacting standard applied to a *Monell* claim based on a single incident. *See Brown*, 386 F.3d at 292-93.

7

finding insufficient evidence of pretext and points to countervailing medical evidence and a number of procedural irregularities that in his view show that the PATH employees' stated basis for terminating him was pretextual. This evidence, viewed in the light most favorable to Abrams, shows at most that the Board of Doctors and the Special Board of Adjustment mistakenly determined that he was medically unfit for the position of Trackman I. The evidence does not show that PATH's reliance on their determinations was so implausible as to be a pretext for racial discrimination.[4] *See Kautz v. Met-Pro Corp.*, 412 F.3d 463, 467 (3d Cir. 2005); *Abramson v. William Paterson College of N.J.*, 260 F.3d 265, 283 (3d Cir. 2001).

## IV. Conclusion

For the foregoing reasons, we will affirm the grant of summary judgment.

---

[4] In addition to this evidence, Abrams also points to the letter he wrote to the EEOC and testimony from his deposition, both of which identify several white trackmen who were not terminated despite medical conditions that he claims are comparable to his. However, Abrams acknowledged that he had not seen these employees' medical records and presented no evidence that these employees' had been diagnosed with such conditions or that their doctors had stated in written reports and under oath—as his doctor had done—that they could not meet certain requirements of the Trackman I position. Although "comparative evidence is often highly probative of discrimination," *Anderson v. Wachovia Mortg. Corp.*, 621 F.3d 261, 268-69 (3d Cir. 2010), this evidence is insufficient because it does not show that the white employees are similarly situated to him, *i.e.*, "alike in all relevant aspects," *Startzell v. City of Philadelphia*, 533 F.3d 183, 203 (3d Cir. 2008).