**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 14-3861

DAVID JERRI, JR.; DAVID JERRI, SR.,
Appellants

v.

FREDERICK HARRAN, IN BOTH HIS OFFICIAL CAPACITY AS DIRECTOR OF
PUBLIC SAFETY, BENSALEM TOWNSHIP, PENNSYLVANIA, AND IN HIS
INDIVIDUAL CAPACITY; JOSEPH DIGIROLAMO, IN BOTH HIS OFFICIAL
CAPACITY AS MAYOR OF BENSALEM TOWNSHIP, PENNSYLVANIA, AND IN
HIS INDIVIDUAL CAPACITY; PATRICK PONTICELLI, IN BOTH HIS OFFICIAL
CAPACITY AS DEPUTY DIRECTOR OF PUBLIC SAFETY, BENSALEM
TOWNSHIP, PENNSYLVANIA, AND IN HIS INDIVIDUAL CAPACITY; JOHN
MONAGHAN, IN BOTH HIS OFFICIAL CAPACITY AS DETECTIVE, BENSALEM
TOWNSHIP, PENNSYLVANIA, AND IN HIS INDIVIDUAL CAPACITY; KNIGHTS
COLLISION CENTER; MICHAEL PIERSON, IN BOTH HIS OFFICIAL CAPACITY
AS OWNER OF KNIGHTS COLLISION CENTER,
AND IN HIS INDIVIDUAL CAPACITY

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civil Action No. 2-13-cv-01328)
District Judge: Honorable Michael M. Baylson

Submitted Under Third Circuit LAR 34.1(a)
April 14, 2015

Before: AMBRO, VANASKIE, and SHWARTZ, Circuit Judges

(Opinion filed:  August 10, 2015)

AMBRO, Circuit Judge

David Jerri, Sr. and David Jerri, Jr. claim that appellees, various Bensalem Township officials, retaliated against Jerri, Sr. for exercising his First Amendment rights and falsely arrested and maliciously prosecuted Jerri, Jr. The District Court granted summary judgment to appellees, and, for the reasons that follow, we affirm in part, vacate in part, and remand.

## I. Facts

Appellants are a father and son. Jerri, Sr. was chief of the Union Fire Company ("Union"), of which his son was a member. The core of the parties' fight relates to a $1,000,000 fire boat that Union purchased over the vigorous objection of Defendant Frederick Harran, the Director of Public Safety for Bensalem Township.

Union first set its eyes on the boat in 2008 when Vincent Troisi was the chief. He applied for a grant from the Federal Emergency Management Agency ("FEMA") for $750,000 and proposed that Union would pay the rest. Union's annual budget is about $300,000 and is funded by Bensalem ($150,000), the local Volunteer Firefighters' Relief Organization ($130,000), and private contributions ($10,000–$20,000). In addition to the nearly $250,000 that Union needed to put up for the sticker price of the boat, it turned out

---

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

that Union paid $25,000 in counsel fees and $28,000 to a consultant in the course of the acquisition. A. 1061. Union took on $94,000 in bank debt to cover these expenses, and it allocated $42,000 per year to maintenance. Thus, the boat was, to say the least, a significant expenditure to the Township-funded company.

According to the Township, it was also a boondoggle. Chief Troisi's application to FEMA for funds to cover purchasing the boat argued that it would be useful in combating "IED (Improvised Explosive Device) attacks involving small craft or underwater swimmers" and to "address prevention of IED attacks on passenger and/or vehicle ferries." A. 1058. It bears noting that, according to Jerri, Sr.'s deposition, there have not been ferries near Bensalem since the 1930s, to say nothing of IED attacks on them. A. 1031:21–22.

Harran opposed the boat's purchase and, in the course of his disagreements with Troisi on June 13, 2011, suspended Union's operation. In response, Troisi resigned, and Union agreed to allow an oversight committee to be created to investigate Union's finances and practices. This committee was created in short order, and Union was reinstated on June 17 with Raymond Hackman III as chief. A. 919. Six weeks later, Union's membership elected Jerri, Sr. as chief. He also supported the fire boat, and he succeeded where Troisi had failed: in January 2012, the boat, nicknamed "the Bear on the Delaware," was delivered to the Neshaminy State Park Marina. A. 1059.

According to Jerri, Sr., his responsibilities as fire chief were "[t]o oversee the day-to-day operations of [his] subordinates, to make sure that [his] junior officers were performing their task[s] as far as training [and] maintenance, make sure everybody stayed

3

up-to-date on their certifications . . . , and to be liaison between the fire company and the [t]ownship." A. 247–48. Although Jerri, Sr. dances around the question a bit in his deposition, "[w]hen it comes down to it," he testified, Harran was his boss. A. 251. Shortly after Jerri, Sr.'s election as chief, he had correspondence by phone, email, and letter with Harran, who on August 11, 2011, "request[ed] that any issues regarding the Union Fire Company . . . be discussed in private and not at a [Township] council meeting." A. 1112.

Jerri, Sr.'s brief tenure as Union's Chief was tumultuous. He disagreed with Harran about the boat, which Jerri, Sr. claims to have viewed as vital for public safety. Harran was upset with what he perceived to be mismanagement by Union; at one point, he asked to see Union's insurance contract for the boat. Jerri, Sr. would not provide him with the documentation and instead hired a lawyer. Jerri, Sr. also believed that Harran went so far in his opposition to the boat as to attempt to sabotage Union's grant application. A. 304, 307. When the grant was awarded, Jerri, Sr. believed the Township wrongly reported it as an asset on its municipal budget (according to Jerri, Sr., the grant was awarded directly to Union) and then wrongly reported that the Township had spent the money on the boat.

On August 22, 2011—after Harran's letter telling him not to bring his complaints to a Township council meeting—Jerri, Sr. attended such a meeting to complain about his differences with Harran. Though his deposition is a little unclear on the precise timeline, it appears that just before the meeting Harran told Jerri, Sr. that "[Harran] doesn't like [Jerri, Sr.] talking shit about him." A. 1007. Jerri, Sr. responded that he "had freedom of

4

speech," and Harran said he wasn't sure, but if Jerri, Sr. "didn't like it [he] could sue."

*Id.*

At the meeting, Jerri, Sr. "spoke to a reporter from the Bensalem Patch." A. 256. His testimony at the council was brief; he said, "After I threatened to come to here—safety issues that Fred [Harran] used to close the fire company down. This may not be the proper venue for me to address this, but I would just like the opportunity to sit down with maybe several of you and the mayor and go over these issues because there is really nothing on here concerning safety." A. 1115. The council president cut him off and suggested he call the mayor the next day to schedule a meeting, which the mayor agreed would be best. A. 1115–16.

After the meeting, Harran sent Jerri, Sr. a letter telling him to bring up "any issues that the Union Fire Company may have with the [T]ownship" with the oversight committee that had been created after Troisi's resignation. A. 1119. Jerri, Sr. interprets this letter as telling him not to speak at future Township council meetings, but the letter does say, "[Y]ou will continue to be welcome to attend any council meetings *and speak* during the Public Comment portion." A. 1119 (emphasis added).

Jerri, Sr. communicated his disagreements with Harran about the boat to "the Bucks County Controller's Office, the FBI, Bensalem Township Auditor, and the Pennsylvania State Fire Commissioner." A. 304. Throughout his tenure as Union's chief, Jerri, Sr. communicated with Danny Adler, a reporter, to complain about Harran's decision to shut down the fire department (which Jerri, Sr. deemed a hardball tactic to get Union to abandon its boat purchase). A. 230–32, 262–63. Before he had become fire

5

chief, Jerri, Sr. had also tipped an employee of Fox TV about the shutdown, alleging that Harran had "issued standing orders to arrest on site [*sic*] any member of [Union] on any fire apparatus in Bensalem" and that "ANY fire in Union fire companies local WILL be considered arson and the members of [Union] be [*sic*] investigated as such."  A. 290.

In July 2012 Harran again suspended Union's operation.  Shortly thereafter, Jerri, Sr. resigned, the boat was turned over to FEMA, and Union was again permitted to fight fires in Bensalem.

But pushing Jerri, Sr. out was not enough, he and his son allege.  Township officials also orchestrated what Jerri, Jr. believes was a sham prosecution against him for insurance fraud.  Jerri, Jr. injured his hand and filed for workers' compensation.  He claims he sustained an injury when fighting a fire, but he was accused of hurting himself while playing hockey.  Defendant Detective John Monaghan investigated the injury.  A supervisor of Jerri, Jr. at Knights Collision, an auto body shop, told Monaghan that Jerri, Jr. had injured himself in a hockey game; others told Monaghan it had been in the fire.  Monaghan filed a criminal complaint against Jerri, Jr., reciting the hockey story and stating that it was corroborated by two supervisors at Knights Collision.  The affidavit of probable cause in support of the complaint omits any exculpatory information that Monaghan learned in his investigation.

Jerri, Jr. and Sr. sued, the District Court granted summary judgment to the Defendants, and this appeal followed.

6

## II.    Discussion

### A.    *Jerri, Sr.'s First Amendment Claim*

In order to state a claim under 42 U.S.C. § 1983 for retaliation for exercising one's First Amendment rights, "a public employee plaintiff must allege that his activity is protected by the First Amendment, and that the protected activity was a substantial factor in the alleged retaliatory action." *Gorum v. Sessoms*, 561 F.3d 179, 184 (3d Cir. 2009). To establish that the activity was protected by the First Amendment, the plaintiff must show that he or she spoke as a citizen and on a matter of public concern. *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006).

Indeed, the only issue we decide is whether Jerri, Sr. spoke "as a citizen." After making this showing, a plaintiff must persuade the court that the employee's interests "as a citizen, in commenting upon matters of public concern" outweighs "the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968); *see also Hill v. Borough of Kutztown*, 455 F.3d 225, 241–42 (3d Cir. 2006) (outlining elements of First Amendment claim). "Determining whether [Jerri's speech] is protected activity under *Pickering* is an issue of law for the court to decide." *Green v. Phila. Hous. Auth.*, 105 F.3d 882, 885 (3d Cir. 1997). The District Court concluded that Jerri, Sr. did not speak as a citizen and thus did not reach the *Pickering* question. We ordered supplemental briefing on the matter. The parties have made plausible arguments in support of their positions, but we deem it prudent to remand to the District Court to

7

weigh the *Pickering* balance in the first instance, as "we are a court of review, not first view." *Haskell v. Harris*, 745 F.3d 1269, 1271 (9th Cir. 2014).

## 1. Standard of Review

Whether speech is protected, and thus whether Jerri, Sr. spoke as a citizen, is a question "of law, not fact." *Connick v. Myers*, 461 U.S. 138, 148 n.7 (1983). Whether speech is protected depends on the answers to several fact-intensive questions: what did a person say, in what form, in what context, what was the scope of his employment, and was the speech on a matter of public concern? Thus we must carefully examine the whole record in light of the parties' arguments and "mak[e] an independent constitutional judgment on the facts of the case" to determine whether the plaintiff spoke as a citizen. *Id.* at 150 n.10.

## 2. Law of Citizen vs. Employee Speech

Defendants urge that Jerri, Sr.'s complaints were made "pursuant to [his] official duties" and not as a citizen outside his professional obligations. *Garcetti*, 547 U.S. at 421. "[T]he 'proper inquiry' into what are an individual's official duties 'is a practical one.' *Garcetti*, 547 U.S. at 424." *Gorum*, 561 F.3d at 185. Thus, although a person's formal job description may be relevant, the true scope of someone's official responsibilities will generally need to be established by evidence revealing the actual policies and practices of a workplace. *See Garcetti*, 547 U.S. at 424 (rejecting possibility "that employers can restrict employees' rights by creating excessively broad job descriptions").

8

We have held "that a claimant's speech might be considered part of his official duties if it relates to 'special knowledge' or 'experience' acquired through his job." *Gorum*, 561 F.3d at 185. At the same time, courts have emphasized that the First Amendment protects speech by employees who are "the members of a community most likely to have informed and definite opinions" on issues of public concern related to their job. *Pickering*, 391 U.S. at 572. If there is tension between these lines of cases, it can be resolved by underscoring "that *Garcetti*'s 'pursuant to official duties' test requires a practical inquiry." *Dougherty v. Sch. Dist. of Phila.*, 772 F.3d 979, 989 (3d Cir. 2014). While the fact that a person learned something about which he complained on the job may be a factor in determining whether the speech was made as a citizen, "it bears emphasis that whether an employee's speech 'concern[s] the subject matter of [his] employment' is 'nondispositive' under *Garcetti*, 547 U.S. at 421. This is because the First Amendment necessarily 'protects some expressions related to the speaker's job.' *Id.*" *Dougherty*, 772 F.3d at 989 (alterations in original).

It is also helpful to separate the "as a citizen" prong from the "matter of public concern" inquiry. Whether a person speaks as a citizen depends less on the subject matter—though that is relevant—than on the manner of speech, specifically whether the plaintiff is "expected, pursuant to [his or her] job duties," to make the speech that is at issue. *Foraker v. Chaffinch*, 501 F.3d 231, 241 (3d Cir. 2007), *abrogated on other grounds by Borough of Duryea, Pa. v. Guarnieri*, 131 S. Ct. 2488 (2011).

Finally, and importantly in the context of this case, in evaluating whether Jerri, Sr. has stated a claim under § 1983, "[t]he [C]ourt . . . cannot make a superficial

9

characterization of the speech or activity taken as a whole . . . . Instead, it must conduct a particularized examination of each activity for which the protection of the First Amendment is claimed." *Johnson v. Lincoln Univ.*, 776 F.2d 443, 451 (3d Cir. 1985). This inquiry requires a sensitive analysis that attends to "the content, form, and context of a given statement, as revealed by the whole record." *Gorum*, 561 F.3d at 187.

### 3.    The District Court's Opinion

The District Court held that "all relevant speech concerned the affairs of" Union and that therefore a precedent of our Court required dismissal. *Jerri v. Harran*, No. 13-cv-1328, 2014 WL 2586960, at *2 (E.D. Pa. June 10, 2014) (citing *Houston v. Twp. of Randolph*, 559 F. App'x 139 (3d Cir. 2014) (not precedential)). In stating that conclusion, the District Court evaluated all the speech in the case together without engaging in the more particularized examination that *Johnson* requires.

*Houston* was a not precedential opinion, and thus even if its facts were analogous to this case, the District Court would not have been bound by it. But we note that *Houston* did not hold that an employee's speech about his place of employment is categorically unprotected. Nor could it have: the Supreme Court in *Pickering* recognized that employees' speech about their work is particularly worthy of protection because employees are "the members of a community most likely to have informed and definite opinions" about their jobs. 391 U.S. at 572. Instead, in *Houston* the plaintiff (a firefighter responsible for training other firefighters) disagreed with the chief about how many people it was appropriate to send out on teams responding to fires. He complained to the chief that it was dangerous to allow teams with fewer than five firefighters. A

10

panel of this Court applied *Garcetti* to hold that Houston's job description was "to correct errors and deviations in [fire department] procedures," and thus his speech was made "pursuant to [his] official duties." *Houston*, 559 F. App'x at 142 (second alteration in original). The crucial fact in *Houston* was not that the speech concerned the fire department; it was that Houston's job was to communicate disagreements about the way the fire department operated to the chief. Under *Garcetti*, that sort of speech is unprotected.

### 4. Jerri Spoke as a Citizen.

Applying the proper test here, it appears that much of Jerri, Sr.'s speech was made as an employee (and thus is unprotected), but some of it was made as a citizen. (Note that it does not follow from the fact that it was made as a citizen that it is protected speech; it still needs to have been made on a matter of public concern, and Jerri, Sr.'s interest in saying it must outweigh the Township's interest in maintaining an orderly fire department.)

Jerri, Sr. did not speak as a citizen when he made his complaints directly to the defendants, who are all Township officials. One of his job responsibilities as chief was to liaise with the Township on matters that concerned Union, and he did so when, for example, he "complained to Defendants" about "waste occurring on the part of Defendants with respect to a non-functional fire training center." A. 310. And, as a general matter, expressing concern about an employer's actions "up the chain of command," *Foraker*, 501 F.3d at 240, particularly when the employee is not advocating "ideas, principles and projects," *Hill*, 455 F.3d at 242, that a supervisor opposes, is

11

unlikely to be protected. When Jerri, Sr. sought to bring Defendants' attention to alleged waste that harmed Union, he was doing what a fire chief is meant to do, and thus he cannot be said to have acted in those contexts as a citizen.

Nevertheless, Harran, Jerri, Sr.'s boss, specifically told him to raise issues about Union and Bensalem "in private" and "not at a council meeting." Jerri, Sr. instead went to a Township council meeting where he spoke to a reporter. He was in regular contact with a different reporter while he was chief to whom he relayed complaints about Bensalem, and he also complained about Bensalem's handling of the boat to "the Bucks County Controller's Office, the FBI, Bensalem Township Auditor, and the Pennsylvania State Fire Commissioner." A. 304. Similarly, the plaintiff in *Pickering* raised his complaints to a reporter by way of a letter to the editor. 391 U.S. at 566. Jerri, Sr.'s job duties do not include making complaints to reporters or the FBI; in fact, his boss specifically forbade him from doing so by demanding he raise his complaints in private.

Although it is true that Jerri, Sr.'s speech concerned his employment as fire chief, we have held that such a consideration is not dispositive. *Dougherty*, 772 F.3d at 989. Instead, the crucial question is whether the plaintiff is "expected, pursuant to [his or her] job duties," to make the relevant speech. *Foraker*, 501 F.3d at 241. Quite simply, there is no record evidence (and it would seem illogical) to suggest that Jerri, Sr. was expected to make the complaints he did to reporters and law enforcement, and thus Jerri, Sr. spoke as a citizen when he complained about the boat business to all and sundry.

12

### 5. Qualified Immunity

The parameters of when a person speaks as a citizen are sufficiently clear that, given the posture of this case and the arguments before us, it would be inappropriate to affirm on the basis of qualified immunity, which only "protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal quotation marks omitted). As *Garcetti* and our precedential opinions make clear, a person who speaks outside his job duties speaks as a citizen. Moreover, this case is analogous to *Pickering* when it involves speech made to the press. The law governing the narrow issue before us—whether, assuming all the other elements of a First Amendment claim are satisfied, speech made as a citizen is protected—is clearly established, hence rendering qualified immunity inappropriate.

We thus vacate with respect to Jerri, Sr. and remand.

### B. *Jerri, Jr.'s Malicious Prosecution and False Arrest Claims*

Jerri, Jr. argues that his arrest and prosecution for insurance fraud violated the Fourth Amendment's prohibition on unreasonable seizures. He thus brings a claim for false arrest and malicious prosecution under § 1983. The elements of a malicious prosecution claim are:

> (1) the defendants initiated a criminal proceeding;
> (2) the criminal proceeding ended in the plaintiff's favor;
> (3) the proceeding was initiated without probable cause;
> (4) the defendants acted maliciously or for a purpose other than bringing the plaintiff to justice; and

13

(5) the plaintiff suffered a deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding.

*DiBella v. Borough of Beachwood*, 407 F.3d 599, 601 (3d Cir. 2005). A plaintiff states a claim for false arrest when he shows that the arrest was "made without probable cause to believe that a crime has been committed." *Barna v. City of Perth Amboy*, 42 F.3d 809, 819 (3d Cir. 1994).

The primary difference between the torts Jerri, Jr. alleges is that "[a] claim for false arrest, unlike a claim for malicious prosecution, covers damages only for the time of detention until the issuance of process or arraignment, and not more." *Johnson v. Knorr*, 477 F.3d 75, 82 (3d Cir. 2007) (alteration in original). Probable cause to arrest on one charge does not insulate a defendant from liability for malicious prosecution on another. *Id.* at 84–85. However, Jerri, Jr.'s arrest and prosecution were for the same alleged conduct, nor is it alleged that any new information bearing on probable cause came to light between arrest and prosecution. In this context, probable cause to arrest Jerri, Jr. would defeat his malicious prosecution claim as well. Because Jerri, Jr. has not pointed to sufficient evidence for a reasonable juror to view his arrest as lacking probable case, we affirm.

In considering a false arrest claim, we have defined "probable cause" as "reasonable grounds for the initiation of the criminal proceeding." *Kossler v. Crisanti*, 564 F.3d 181, 194 (3d Cir. 2009). This standard requires the state official who initiated the proceeding to have a reasonable belief, based on his or her perception of the relevant facts and circumstances, to believe the defendant committed the offense or offenses

14

charged. *Id.* Moreover, even if a defendant is arrested pursuant to a warrant that appears supported by probable cause, he may state a claim for false arrest if the prosecuting official "knowingly and deliberately, or with a reckless disregard for the truth, made false statements or omissions that create a falsehood in applying for a warrant; and . . . such statements or omissions are material, or necessary, to the finding of probable cause." *Wilson v. Russo*, 212 F.3d 781, 786–87 (3d Cir. 2000).

In this case, Detective Monaghan submitted an affidavit of probable cause to initiate criminal proceedings against Jerri, Jr. for insurance fraud. The affidavit stated that Jerri, Jr. informed Michael Pierson and Robert Searfoss, his supervisors at Knights Collision, that he injured his hand playing hockey. Nonetheless, Jerri, Jr. submitted a claim for workers' compensation, stating that he had injured his hand while fighting a fire. The affidavit also stated that Jerri, Jr.'s insurance company terminated his benefits because his "injury was not within the scope of [his] employment." A. 1224. On its face, the affidavit of probable cause sufficiently stated a reasonable belief that Jerri, Jr. had made a material misstatement of the cause of his hand injury and thus committed insurance fraud.

Because the affidavit is facially sufficient, the question becomes whether Jerri, Jr. can point to record evidence which, if accepted as true and drawing all reasonable inferences in his favor, could lead a reasonable juror to conclude that Detective Monaghan recklessly, knowingly, or deliberately made material false statements or omissions in the affidavit. To support his contention that Monaghan did so, Jerri, Jr. points to statements by three firefighters (Zac Breig, Cryil Pyle, and Conor McIntyre) and

15

Jerri, Jr.'s girlfriend (Meghan Onifri) who corroborated Jerri, Jr.'s version of events, as well as a few investigative paths that neither confirmed nor undermined Monaghan's hypothesis that Jerri, Jr. had injured his hand playing hockey. Appellants Br. 29–32. He also points to Pierson's deposition, where he testified that he had his information about Jerri, Jr.'s injury from Searfoss, A. 614, contrary to what Detective Monaghan wrote in the affidavit of probable cause ("Pierson asked [Jerri, Jr.] what he did to his hand[;] he told [Pierson] he had hurt it playing hockey the night before." A. 1224).

The problem for Jerri, Jr. is that he points to no reason why Detective Monaghan had to credit the firefighters and Jerri, Jr.'s girlfriend and not the persons at Knight's Collision. All that the evidence to which Jerri, Jr. points shows is that Detective Monaghan had conflicting information. There is no reason to doubt that Searfoss told Monaghan that Jerri, Jr. had suffered a hockey injury. And although it is possible that Detective Monaghan misstated Pierson's report of who told him how Jerri, Jr. was injured, that misrepresentation—assuming as we must that it was indeed a false statement—was not material. First, Searfoss's report by itself provides sufficient probable cause to support the affidavit, and, in any event, Pierson's deposition testimony makes clear that, whatever the source of his information, Pierson believed that Jerri, Jr. "said he hurt his hand playing hockey." A. 1195. Monaghan was under no obligation to pour all the evidence he had amassed into his probable cause affidavit; instead, he was permitted to point only to the evidence that supported a finding of probable cause to begin a criminal case. To be sure, if the interviews Jerri, Jr. cites occurred as the witnesses testify they did, Detective Monaghan may well have been obligated to disclose

16

them to Jerri, Jr. pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), but no source of law obliged him to tell both sides of the story in his criminal complaint.

Thus we affirm with respect to the decision against Jerri, Jr.

**III.    Conclusion**

We affirm the award of summary judgment with respect to Jerri, Jr.  However, at least some of Jerri, Sr.'s speech was made as a citizen.  As this was the only prong of the analysis of a First Amendment retaliation claim that the District Court analyzed, we vacate its decision and remand to consider *Pickering* and any other aspects of Jerri, Sr.'s claim that continue in dispute.